STEPHEN THOMAS ERB (SBN 125248)
STEPHEN THOMAS ERB, APC
11440 West Bernardo Court, Suite 204
San Diego, California 92127
Telephone:   (858) 487-2728
Facsimile:   (858) 487-5886
Email:  s.erb@erbapc.com

Attorney for Defendant and Counterclaimant
ConocoPhillips Company

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMADA BULK CARRIERS, LTD, a Foreign Corporation, | Case No. C 05-3406 SC |
| Plaintiff, | **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| CONOCOPHILLIPS COMPANY, INC., a Delaware Corporation, FOSS MARITIME COMPANY, INC., a Washington Corporation; FOSS MARITIME BARGE 185 P3, *in rem*; SPAR SHIPHOLDING, AS, a Foreign Corporation; M/V SPAR TWO, *in rem* | **LODGED BY DEFENDANT & COUNTERCLAIMANT CONOCOPHILLIPS COMPANY** |
| Defendants. | Final Pretrial Conf.: May 4, 2007 |
| AND ALL RELATED COUNTERCLAIMS | Trial: May 7, 2007 |

This matter came on regularly for trial on May 7, 2007, before the Honorable Samuel Conti of the United States District Court for the Northern District of California sitting without a jury. After consideration of all the evidence presented by the parties, the arguments of counsel, and the written briefing provided to the Court, the Court hereby makes the following Findings of Fact and Conclusions of Law.

//

//

# FINDINGS OF FACT

1. This is an action arising out of the sale of bunker fuel to the charterer of a vessel engaged in maritime commerce and thus falls within the admiralty jurisdiction of this Court.

2. On or about May 13, 2005, plaintiff and counterdefendant Armada Bulk Carriers, Ltd. ("Armada"), a Swiss corporation, entered into a time charter of the M/V Spar Two, a 623-foot bulk carrier owned by Spar Shipholding AS ("Spar"). At the time, the M/V Spar Two was under a long-term time charter to Bulkhandling Handysize AS ("Bulkhandling"), which in turn subchartered the vessel to Armada.

3. Pursuant to the charter party between Bulkhandling and Armada, Armada was required to replenish bunker fuel consumed during its chartered voyage from Southeast Asia to the United States West Coast.

4. Armada retained World Fuel Services, Inc., an experienced international marine fuels broker, to procure a contract of sale for approximately 550 metric tons of IFO 180 heavy oil from a supplier in the San Francisco Bay Area.

5. ConocoPhillips Company ("ConocoPhillips") is a major-brand producer and marketer of petroleum products, which maintains a storage and distribution marine terminal in Richmond, California ("Richmond Terminal").

6. The ConocoPhillips Richmond Terminal has three aboveground storage tanks and interconnected pipelines dedicated to its heavy oils, or "blacks oils," business. These shore tanks and pipelines are not connected to the remainder of the terminal.

7. Back in mid-2004, ConocoPhillips assumed direct operation of the black oils business at Richmond Terminal, including the sale of marine bunker fuels. At that time, ConocoPhillips thoroughly cleaned each shore tank, stripping each to bare metal, then inspected and repaired each of them. The ConocoPhillips Richmond Terminal does not accept or handle ship slops or sludge, waste oils, or other off-specification, contaminated fuel oil.

8. On or about June 14, 2005, World Fuel Services, Inc., acting on Armada's behalf, inquired whether ConocoPhillips could deliver 550 metric tons of IFO 180 grade fuel oil to Armada's chartered vessel, the M/V Spar Two.

9. ConocoPhillips replied by email message to Armada's broker setting forth verbatim the specifications of IFO 380 grade heavy oil it had available for sale in its Richmond Terminal shore tank 3927, asking if the specifications were acceptable.

10. Armada's broker responded by suggesting that marine diesel oil, or "cutter," be added to lower the viscosity of the fuel oil to 180 centistokes at 50°C. Armada's broker did not object to any other product specification, and did not request that any further laboratory analyses be provided or conducted.

11. ConocoPhillips replied that it could not guarantee uniform blending of the cutter into the heavy oil because Richmond Terminal did not have in-line (or shoreside) blending capability. ConocoPhillips stated that the blend would be approximately 3400 barrels of heavy oil (about 95%) with 150 barrels of "cutter" (about 5%).

12. Armada's broker confirmed that this approach was acceptable, and that he would advise Armada of the blending details. It was therefore understood by the parties, in advance, that the product mixing would occur by means of gravity blending once the two different grades of petroleum product were loaded aboard defendant Foss Maritime's ("Foss") delivery barge, the Barge 185 P3.

13. On June 14, 2005, Armada and ConocoPhillips entered into a three-page Spot Sale Agreement for the sale of about 550 metric tons of IFO 180 bunker fuel oil to be delivered by barge on June 19 or 20, 2005, to the M/V Spar Two in San Francisco Bay, California. The Spot Sale Agreement required the fuel oil meet RME 25 specifications with the exception of vanadium, which was to be "typically 265 ppm."

14. The Spot Sale Agreement expressly incorporated by reference ConocoPhillips's April 1, 2004 "Products Purchase/Sale Agreements General Terms and Conditions" which, in turn, incorporated its "Marine Fuels Purchase/Sale Addendum." The Spot Sale Agreement also superseded and rejected any inconsistent

or additional terms set forth in other order confirmations. Both parties have affirmatively alleged, and both have admitted in their responsive pleadings, that these three written contract documents, and no others, comprise the contract of sale between Armada and ConocoPhillips.

15. The ConocoPhillips "General Terms and Conditions" provide, in pertinent part, as follows:

> 2.2 <u>FOB Delivery:</u>
>
> Delivery shall be deemed complete and title and risk of loss shall pass from Seller to Buyer... in the case of vessel deliveries as Product passes the vessel's permanent flange at the load port.

Armada has affirmatively alleged: "Pursuant to the terms of the contract, the title and risk to the fuel oil passed from ConocoPhillips to Armada at the permanent flange of the barge that was used to transport and deliver the fuel oil, Foss 185 P3."

16. The ConocoPhillips "Marine Fuels Purchase/Sale Addendum" provides, in pertinent part, as follows:

> ConocoPhillips' Products Purchase/Sale General Terms and Conditions ("Seller's General Terms and Conditions") are incorporated by this reference. In the event of a conflict between Seller's General Terms and Conditions and the following terms and conditions, the terms of the latter shall prevail.
>
> * * *
>
> 3. <u>GRADES.</u>
>
> A.   ...SELLER'S FUEL GRADES WILL CONFORM TO ISO 8217 SPECIFICATIONS. OTHER MINIMUM AND MAXIMUM QUALITY SPECIFICATIONS SHALL BE AS SET FORTH IN THE SALES CONFIRMATION.
>
> * * *

6. <u>SAMPLING AND QUALITY.</u>

A. UNLESS A MUTUALLY ACCEPTABLE INDEPENDENT INSPECTOR IS APPOINTED TO TAKE SAMPLES (WHOSE FEES SHALL BE BORNE EQUALLY BY SELLER AND BUYER), SELLER SHALL TAKE NOT LESS THAN TWO (2) IDENTICAL SAMPLES *IN ACCORDANCE WITH ITS NORMAL PROCEDURES AT THE DELIVERY PORT*. (emphasis supplied)

\* \* \*

BUYER HAS A RIGHT TO HAVE A REPRESENTATIVE WITNESS SUCH SAMPLING.

B. *BUYER WAIVES ANY OBJECTIONS TO THE SAMPLING PROCEDURES ACTUALLY EMPLOYED UNLESS BUYER HAD A REPRESENTATIVE WITNESS SAMPLING AND AT THE TIME OF DELIVERY GAVE SELLER A WRITTEN PROTEST ABOUT THE PROCEDURES.* (emphasis supplied)

THE SAMPLES SHALL BE SEALED AND LABELED BY EITHER THE BARGE COMPANY REPRESENTATIVE, SELLER'S REPRESENTATIVE OR INDEPENDENT INSPECTOR, AS THE CASE MAY BE. THE CHIEF ENGINEER WILL ACKNOWLEDGE RECEIPT OF THE SAMPLE DELIVERED TO THE VESSEL BY SIGNING AND DATING EITHER A RECEIPT OR THE SAMPLE LABEL.

C. ONE SAMPLE WILL BE GIVEN TO THE VESSEL AT THE TIME OF DELIVERY. NOT LESS THAN ONE (1) SAMPLE SHALL BE RETAINED BY SELLER FOR AT LEAST 60 DAYS, OR LONGER IF BUYER HAS MADE A QUALITY CLAIM AGAINST SELLER DURING THAT PERIOD.

7. <u>CLAIMS.</u>

\* \* \*

B. ANY CLAIM BY BUYER FOR QUALITY DEFICIENCY OR NONCONFORMITY MUST BE RECEIVED BY SELLER IN

> WRITING AND ACCOMPANIED BY ALL THEN AVAILABLE SUPPORTING DOCUMENTS WITHIN THIRTY (30) DAYS OF DELIVERY. IT IS A PRE-CONDITION OF SELLER'S CONSIDERATION OF A QUALITY CLAIM THAT AT THE TIME BUYER GIVES SELLER NOTICE, THAT BUYER HAS RETAINED ITS SEALED RETAIN SAMPLE PROVIDED BY SELLER. BUYER'S NOTICE MUST CONTAIN FULL DETAILS INCLUDING: THE QUANTITIES AND LOCATIONS OF ALL BUNKERS ON BOARD THE VESSEL; THE RATE AND QUANTITY OF CONSUMPTION OF BUNKERS CONSUMED; FOR EACH OF THE THREE (3) PRECEDING DELIVERIES TO THE VESSEL, THE QUANTITY, QUALITY AND SPECIFICATION OF PRODUCT SUPPLIED, THE PLACE AND DATE OF SUPPLY AND THE NAME OF THE SUPPLIER; AND THE INFORMATION CONCERNING THE WHEREABOUT OF BUYER'S SEALED RETAIN SAMPLE.
>
> * * *
>
> D.  IN THE EVENT OF A QUALITY CLAIM, THE PARTIES AGREE TO HAVE THE SAMPLE RETAINED BY SELLER ANALYZED BY A MUTUALLY AGREED, QUALIFIED AND INDEPENDENT LABORATORY. THE COSTS OF THE ANALYSIS SHALL BE BORNE EQUALLY BY SELLER AND BUYER. BUYER MAY CAUSE THE TESTING OF THE SAMPLE PROVIDED TO THE VESSEL AT ITS SOLE COST AND EXPENSE; ***HOWEVER, DISPOSITIVE DETERMINATION OF QUALITY OF PRODUCT DELIVERED SHALL BE BASED UPON TEST RESULTS OF AN INDEPENDENT LABORATORY IN THE PORT OF BUNKERING OF THE SEALED AND MARKED SAMPLES RETAINED BY SELLER FROM THE DELIVERY***. (emphasis supplied)
>
> * * *

14. GOVERNING LAW.

> Regardless of where the full is delivered to the vessel, federal maritime law of the United States of America shall be paramount in governing the rights and duties of the parties hereto.

17. The parties agree there is no distinction between "RME 25" and "ISO 8217" specifications, which the Court therefore views to be synonymous.

18. Armada was the party responsible for notifying ConocoPhillips of when the M/V Spar Two would be in port and prepared to accept delivery of the bunkers, and therefore Armada was well aware of the timing of the barge delivery and, in turn, of any additional fuel oil inspection activities that might be undertaken.

19. There is no evidence that Armada ever requested further fuel oil samples be taken by ConocoPhillips or by an independent inspection firm; ever requested permission to witness further fuel oil sampling or obtain its own samples; ever attended the fuel oil sampling activities; or ever objected in writing or otherwise to selection of Columbia Inspection as the independent inspection firm or to its sampling methods.

20. There is also no evidence that Armada or anyone else ever advised ConocoPhillips in advance that the M/V Spar Two's officers and crew members were intending to take a manifold "drip sample" of the fuel oil as it came aboard the M/V Spar Two; that ConocoPhillips was invited or required to observe that sampling and the preparation of sealed sample containers; or that such samples would have any relevance in a dispute over the quality of fuel oil sold to Armada.

21. On June 16, 2005, Armada's Port Captain had gone aboard the M/V Spar Two in Stockton, California, to survey the locations and quantities of bunkers aboard the vessel. Armada did not obtain any samples for analysis. The Master of the M/V Spar Two advised Armada's Port Captain that one of the four (4) fuel oil bunker tanks contained approximately 191 metric tons of reportedly off-specification fuel oil. This fuel oil had been acquired in Honghai, Vietnam, in late March 2005.

22. Neither Armada nor the M/V Spar Two ever advised ConocoPhillips, in advance, that the M/V Spar Two was already carrying approximately 191 metric tons of reportedly off-specification fuel oil. ConocoPhillips also was not informed that there had been a material difference between that previous supplier's certificate of analysis (showing the fuel oil to have met all specifications) and the M/V Spar Two's "manifold drip sample." ConocoPhillips also was not advised that there was approximately 23 metric tons of fuel oil of unknown quality in the bunker fuel oil tank into which the ConocoPhillips fuel oil reportedly was delivered.

23. On the date scheduled for delivery, June 20, 2005, ConocoPhillips followed its normal procedures at the Richmond Terminal by retaining Columbia Inspection, an independent fuel oil inspection firm, to gauge its shore tanks and the Foss Barge 185 P3's compartments as well as to obtain fuel oil samples in the event further analyses were required. ConocoPhillips had previously used independent inspection firms to certify the quality of the heavy oil delivered into shore tank 3927 on or about May 31, 2005, as well as the quality of the shore tank contents on June 6, 2005, following blending with a Rodeo refinery product, "HSCAT," on or about June 3, 2005.

24. On June 20, 2005, Columbia Inspection's sampler, Mr. Hussain Nassir, followed his normal procedures in obtaining samples from shore tanks 3927 and 3944. Tank 3944 contained the lower-viscosity "cutter" stock. These samples were maintained in the continuous custody of Columbia Inspection and were later analyzed as a 95%-5% composite blend when the M/V Spar Two and Armada raised concerns about the quality of the fuel oil.

25. The heavier grade fuel oil from shore tank 3927 was loaded onto the Foss Barge 185 P3 first and distributed equally across four (4) barge compartments. The lighter cutter stock was then loaded into each compartment. The fuel oil was loaded from the bottom of the barge compartments and, therefore, the lighter cutter stock blended upward into the heavier oil as it was being loaded.

26. Again following his normal procedures, Columbia Inspection's Mr. Nassir next took samples from each of the four (4) barge compartments. As Mr. Nassir explained, given his prior familiarity with the fuel oil product he was sampling, and the comparatively shallow depth of product in each barge compartment, *viz.* about seven (7) feet, he did not deem it necessary to take samples at multiple levels. His samples tended to draw product from the lower portions of the four compartments, where excess water, sediment, ash, and metals, would tend to accumulate *if* they were present.

27. Columbia Inspection maintained continuous custody of these four (4) barge compartment samples, which were later combined in equal volumes to form a barge composite sample for laboratory analysis.

28. Mr. Nassir also prepared two additional barge compartment samples in the field while aboard the Foss Barge 185 P3. He could not recall whether he combined fuel oil from one, two, or several compartments within each sample container. These two samples were then sealed and labeled and given to the Foss tankerman with instructions that one sample be given to the officers or crew of the M/V Spar Two. That delivery was in fact made.

29. On or about June 27, 2005, Armada relayed to ConocoPhillips information Armada had received from the M/V Spar Two's managers concerning the vessel's "manifold drip sample," which had reportedly been analyzed by a laboratory in Houston, Texas. According to Armada, the ConocoPhillips fuel oil failed to meet ISO 8217 specifications for water, ash, aluminum, and silicon. Armada refused to pay the agreed purchase price of $189,906.73, in whole or in part.

30. On June 29, 2005, ConocoPhillips instructed Columbia Inspection to have its laboratory analyze both a shore tank composite sample and a barge compartment composite sample using product drawn on June 20, 2005, by running tests on the contaminants of concern to Armada.

31. Columbia Inspection analyzed and reported that the 95%-5% shore tank composite sample tested 0.30 percent by volume for water, 13 ppm for silicon, and 13

ppm for aluminum. Contract and ISO 8217 specifications allow up to 1.0 percent for water and 80 ppm for silicon and aluminum combined.

32. Columbia Inspection also analyzed and reported that the barge composite sample tested 0.30 percent by volume for water, 5 ppm for aluminum, and 12 ppm for silicon. ConocoPhillips reported these results to Armada and reminded Armada that the ConocoPhillips's samples drawn by the independent inspection firm were binding on Armada by contract.

33. The M/V Spar Two's Chief Engineer had apparently represented that the ConocoPhillips fuel oil had all been loaded into fuel oil bunker tank "1C". On June 29, 2005, Armada and Bulkhandling jointly obtained samples from that bunker tank. ConocoPhillips was not present or represented at this sampling event, and at no time did ConocoPhillips agree that these samples would have any relevance in the parties' fuel quality dispute. The samples were analyzed by BSI Inspectorate, which reported contaminant levels for water, ash, silicon, and aluminum which were appreciably less than the levels found in the vessel's "manifold drip sample," purportedly of the same fuel oil, taken only seven (7) days earlier.

34. On July 6, 2005, ConocoPhillips agreed to have Armada's laboratory of choice, BSI Inspectorate, analyze the sealed barge sample given to Foss on June 20, 2005. All ISO 8217 specifications were analyzed and all were met. The results for water (0.40%), ash (0.052%), aluminum (7 ppm), and silicon (18 ppm) were very similar to Columbia Inspection's analysis of its barge composite sample on June 29, 2005.

35. Armada did not call any witnesses at trial having personal knowledge of the sampling equipment (if any) utilized to obtain the vessel's "drip sample," the events and circumstances surrounding the taking of that sample, the collection of the fuel oil into an initial container and then into secondary sealed sample containers, or the chain of custody in connection therewith. Therefore, independent laboratory analyses of this "drip sample" have not been admitted into evidence.

36. Armada also did not call any witnesses at trial having personal knowledge of the delivery and storage of the ConocoPhillips fuel oil aboard the M/V Spar Two, any transfers between bunker fuel oil tanks, and the quantity of fuel oil in bunker fuel oil tank "1C" at the time samples were drawn. Therefore, the laboratory analysis of the bunker tank sample drawn on June 29, 2005, has not been admitted into evidence on the issue of whether ConocoPhillips tendered conforming goods for delivery on June 20-21, 2005.

37. The fuel oil delivered to the M/V Spar Two was never returned to ConocoPhillips. Armada and the charterers (Bulkhandling), the vessel owners, and the managers of the M/V Spar Two — but not ConocoPhillips — exercised all subsequent and exclusive control over the fuel oil. On September 18, 2005, the ConocoPhillips fuel oil, as well as the Vietnam bunkers, were finally debunkered in Piraeus, Greece. Reportedly, neither the vessel's owners, Bulkhandling, nor Armada received any consideration for the fuel oil. Samples taken of the fuel oil at that time, however, reflected that the fuel oil met all ISO 8217 specifications except for water, which had decreased from 4.8% (according to Armada's "drip sample") to about 2.1%.

38. Armada did not call any witnesses at trial having personal knowledge of the purportedly segregated storage and restricted transfer of the ConocoPhillips fuel oil aboard the M/V Spar Two between June 21, 2005, and September 18, 2005. The Court is therefore unable to make any findings as to whether the ConocoPhillips fuel oil was, or was not, commingled with other fuel oil or with the vessel's slops, or whether any of it was consumed by the M/V Spar Two.

39. To the extent the vessel's Oil Record Book entries are offered by ConocoPhillips as admissions of an entity in privity with a party-opponent, however, Armada has failed to explain the loss of approximately 65 metric tons of fuel oil in tank "1C" between the time the ConocoPhillips fuel oil was loaded and then later debunkered.

40. On or about July 8, 2005, Armada first provided written notice of its fuel quality claim pursuant to the ConocoPhillips "Marine Fuels Purchase/Sale Addendum."

[Proposed] Findings of Fact and Conclusions of Law
Lodged by ConocoPhillips Company

11

Armada provided documentation of only two, not the required three, immediately-preceding fuel oil deliveries onto the vessel. Armada has failed to explain material inconsistencies in documentation and vessel log entries surrounding the March 25, 2005 (or April 1, 2005), delivery of bunkers in Honghai, Vietnam. Armada has never explained the origin or quality of the 23 metric tons of fuel oil already in tank "1C" when the ConocoPhillips fuel oil was reportedly delivered into that bunker tank.

41. Armada has also failed to safekeep and produce the sealed barge sample delivered to the M/V Spar Two by Foss on June 20-21, 2005. That sample was reportedly discarded by Bulkhandling's surveyor before any analysis was conducted, despite apparent instructions by Bulkhandling's counsel that it not be discarded.

42. Armada offered no competent evidence at trial as to the reasonable market value of the fuel oil at the time and in the place it was delivered on June 20-21, 2005.

43. The ConocoPhillips Marine Fuels Purchase/Sale Addendum provides in pertinent part as follows:

**1. IDENTITY OF BUYER.**

> THIS SALE OF MARINE FUELS IS MADE TO THE NAMED VESSEL AND TO THE COMPANY OR PERSON DESCRIBED AS THE "BUYER" IN THE SALES CONFIRMATION WHO WARRANTS HAVING FULL AUTHORITY TO ACT ON BEHALF OF THE NAMED VESSEL.

44. The ConocoPhillips Marine Fuels Purchase/Sale Addendum also specifically provides in pertinent part as follows:

**8. LIMITATION OF LIABILITY.**

* * *

> B. CLAIMS RELATED TO FUEL QUALITY: SELLER'S LIABILITY FOR DELIVERY OF FUEL WITH NON-CONFORMING SPECIFICATIONS SHALL BE LIMITED TO THE COSTS INCURRED TO REMOVE THE FUEL FROM THE VESSEL AND TO REPLACE IT TO THE EXTENT SUCH FUEL WAS DELIVERED UNDER THIS AGREEMENT.

> C. SELLER SHALL NOT BE LIABLE FOR ANY LOSS OF PROFIT OR ANTICIPATED PROFIT, LOSS OF TIME OR HIRE, OVERHEAD EXPENSES, DEMURRAGE OR LOSS OF SCHEDULE, COST OF SUBSTITUTE VESSEL(S), LOSS RELATED TO LOSS OF OPERATIONAL USE OF VESSEL, PHYSICAL LOSS OR DAMAGE (IN WHOLE OR IN PART) OF OR TO VESSEL OR CARGO, OR FOR ANY LOSS OF CONTRACT(S) OF AFFREIGHTMENT TO THE EXTENT THAT THE FOREGOING OF ANY OF THEM ARE CONSEQUENTIAL, INDIRECT OR SPECIAL LOSSES OR SPECIAL DAMAGES NOR WITHOUT PREJUDICE TO THE FOREGOING FOR ANY OTHER CONSEQUENTIAL, INDIRECT SPECIAL LOSSES OR SPECIAL DAMAGES, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS AGREEMENT.

45. The ConocoPhillips General Terms and Conditions also provide in pertinent part as follows:

> 4. <u>PAYMENT</u>.
>
> * * *
>
> 4.3 <u>Interest:</u> Any amount payable for any cargo of Product or otherwise payable by Buyer to Seller hereunder shall, if not paid when due, bear interest from the due date until the date payment is received by Seller at an annual rate (based on a 360-day year) equal to the rate of two (2) percentage points above the prime rate of interest effective for the payment due date as published in the *Wall Street Journal*, but not more than the maximum rate of interest permitted under applicable law. Buyer shall pay such interest within five (5) days following receipt of Seller's invoice for such interest.
>
> * * *
>
> 10. <u>DEFAULT</u>.
>
> * * *
>
> 10.3 The Performing Party's rights under this Section shall be in addition to, and not in limitation or exclusion of, any other rights which the performing Party may have (whether by agreement, operation of law or otherwise) including, but not limited to the sale to a third party of the Product which is the subject of the Agreement. The Non-Performing Party shall

indemnify and hold the Performing Party harmless from all costs and expenses (including reasonable attorney fees) incurred in the exercise of any remedies hereunder.

\* \* \*

14. <u>INDEMNITY.</u>

14.1  Seller and Buyer mutually covenant to protect, defend, indemnify and hold each other harmless from and against any and all claims, demands, suits, losses, expenses (including without limitation, costs of defense, attorney's fees and interest), damages, fines, penalties, causes of action and liabilities of every type and character, including but not limited to personal injury or death to any person including employees of either Party or loss or damage to any personal or real property, caused by, arising out of or resulting from the acts or omissions of negligence or willful acts of such indemnifying Party, its officers, employees or agents with respect to the purchase and sale of Product hereunder. In the event the Parties are jointly and/or concurrently negligent, each Party shall indemnify the other Party to the extent of its negligent acts or omissions or willful acts.

15. <u>LIMITATION OF LIABILITY.</u>

15.1  Except as provided in Section 16 herein and as otherwise provided in the Agreement, neither party shall be liable for any prospective profits or special, indirect, incidental, consequential, punitive or exemplary damages.

\* \* \*

21. <u>ENTIRE AGREEMENT.</u>

21.1  No statement or agreement, oral or written, made prior to or at the signing of this Agreement, shall vary or modify the written terms hereof, and neither party shall claim any amendment to, modification of, or release from any provisions by mutual agreement unless such agreement is in writing, signed by the other Party and specifically states that it is an amendment to, modification of, or release from this Agreement.

\* \* \*

24. <u>ATTACHMENTS/ADDENDA.</u>

24.1 Attached hereto and incorporated by reference herein are certain addenda providing further terms and conditions as applicable.

(a) Marine Fuel Purchase/Sale Addendum

\* \* \*

46. On August 22, 2005, Armada filed suit alleging three claims for relief: Breach of contract, breach of warranty, and negligence, each predicated upon ConocoPhillips's alleged failure to deliver fuel oil meeting ISO 8217 specifications for water, ash, aluminum, and silicon. Armada has not alleged any injury to any person or to property, and seeks damages solely for the product's alleged failure to meet contract expectations, cost of its removal, and the related economic loss associated with carrying the fuel oil aboard the vessel. Armada has not properly alleged a claim for indemnity. ConocoPhillips has asserted counterclaims for the price of goods sold and delivered, breach of contract, and for recovery in *quantum valebant*.

## **CONCLUSIONS OF LAW**

1. This is an action arising out of the sale of bunker fuel to the charterer of a vessel engaged in maritime commerce and thus falls within the Court's admiralty jurisdiction. *Exxon Corporation v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991).

2. ConocoPhillips has separately invoked the diversity jurisdiction of this Court under the "Savings to Suitors" clause of the United States Constitution inasmuch as Armada is a citizen of a foreign state and ConocoPhillips is a citizen of the states of Delaware and Texas. The amount in controversy exceeds $75,000, and actions to enforce contracts of sale were cognizable in the courts of common law as well as in admiralty. *See* 28 U.S.C. § 1332; *Ghotra by Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050 (9th Cir. 1997). All parties have waived trial by jury for purposes of this proceeding, however.

3.      The dispute raised by the pleadings and tried to the Court is governed by American general maritime law, which in turn adopts the common law of contracts and the provisions of the Uniform Commercial Code governing the sale of goods. *See, e.g., Hozie v. The Vessel Highland Light,* 182 F.3d 925 (9th Cir. 1999); *Interpool Limited v. Char Yigh Marine (Panama) S.A.*, 918 F.2d 1476 (9th Cir. 1990).

4.      Parties to commercial contracts of sale are generally free to agree in advance to the rules governing the resolution of disputes arising under those contracts. Courts sitting in admiralty are required to give such provisions their full effect. *See, e.g., Foster Wheeler Energy Corp. v. An Ning Jiang M/V*, 383 F.3d 349, 354-55 (5th Cir. 2004).

5.      The contract of sale between Armada and ConocoPhillips establishes a conclusive presumption that Armada, as the buyer, shall be bound by the laboratory analysis of fuel oil samples taken at the port of delivery in accordance with ConocoPhillips's normal procedures unless the buyer attends the sampling activities and timely objects in writing to the sampling methods employed.

6.      ConocoPhillips has established by a preponderance of the evidence that both ConocoPhillips and the independent petroleum inspection firm, Columbia Inspection, Inc., followed their normal procedures in obtaining and testing shore tank and barge compartment samples in connection with the sale and delivery of fuel oil bunkers to Armada on June 20-21, 2005. When analyzed by independent laboratories, each of the samples indicated that the fuel oil met all ISO 8217 specifications, including those particular specifications Armada alleges were not met. Armada is thus bound by these laboratory analyses.

7.      Pursuant to the terms of the parties' contract of sale, Armada has waived the right to challenge ConocoPhillips's selection of the particular fuel inspection firm, Columbia Inspection, or the sampling methods employed by that firm's inspector. Armada did not attend the sampling activities and did not make timely written objection. Although Armada was aware of the load terminal and the estimated date of delivery,

Armada made no inquiries or requests for permission to attend the sampling. Therefore, Armada had no express or implied contractual right to receive further notice of sampling activities by ConocoPhillips.

8.  The Court nevertheless does find that Armada suffered no prejudice in failing to attend and witness the sampling activities because, under all of the facts and circumstances presented, Columbia Inspection followed normal, commercially reasonable, and industry-accepted practices in obtaining, maintaining, and testing fuel oil samples taken in connection with this sale.

9.  The written contract of sale also reasonably requires, as a condition to buyer's making of a fuel quality claim, that the buyer provide complete and accurate documentation as to the source, quality, storage, consumption, and shipboard transfer of the three immediately-preceding fuel oil bunker deliveries. Armada has failed to satisfy this condition to its making a fuel quality claim.

10.  Given the various conflicting and incomplete vessel log entries and bunker delivery documentation, the Court finds that Armada's material breach of this contract obligation caused direct and substantial prejudice to ConocoPhillips. Whether viewed as a failure of a condition or a material breach of covenant, Armada's failure to adequately document its claim provides a separate and additional basis for denying Armada's claim based upon ConocoPhillips's alleged failure to deliver fuel oil meeting contract specifications.

11.  Armada has also inexcusably failed to ensure the safe-keeping of the sealed barge sample provided to the M/V Spar Two's Chief Engineer on June 20-21, 2005, which was later removed from the vessel and discarded. Armada was unable to produce this sample for testing when its production was requested by ConocoPhillips in discovery. Armada's failure to satisfy this condition to making its fuel quality claim also bars that claim in this Court.

12.  Even if Armada's claims and defenses were not defeated by the conclusive presumption of quality established by the contract of sale, as well as by

Armada's failure to satisfy conditions to its presenting a fuel quality claim, Armada also has failed to meet its burden of proof in showing that the ConocoPhillips fuel oil failed to conform to product specifications at the time it was tendered for delivery.

13. Armada's and ConocoPhillips's claims and defenses are governed by Article II of the Uniform Commercial Code, adopted as part of general American maritime law. *See, e.g., Hozie, supra; Interpool Limited, supra*. Sections 2-607(1) and (4) provide as follows:  (1) The buyer must pay at the contract rate for any goods accepted;  (4) The burden is on the buyer to establish any breach with respect to the goods accepted.

14. Here, Armada accepted allegedly nonconforming goods and never effectively revoked that acceptance. Armada is therefore liable for the agreed purchase price, subject to a setoff measured by the difference in value between the goods as warranted and the value of the goods tendered for delivery. UCC §§ 2-709(1)(a) and 2-714(2).

15. Armada has failed to offer admissible, non-speculative evidence sufficient to meet its burden of showing that the ConocoPhillips fuel oil failed to conform to contract specifications at the time and place it was tendered for delivery, *viz.* at the flange of the Foss Barge 185 P3. As a result, all of Armada's claims fail and ConocoPhillips is entitled to recover the full agreed contract price of $189,906.73. *Cf. Chicago Prime Packers v. Northern Food Trading Co.*, 408 F.3d 894 (7th Cir. 2005) (buyer failed to establish quality of goods at the point tendered for transfer).

16. Armada has neither alleged nor offered any evidence of injury to persons or to other property caused by the ConocoPhillips fuel oil. Its claim, at best, relates solely to the product's failure to meet contract expectations resulting in damages for disposal costs and lost economic opportunity associated with replacing, transporting, and removing the fuel oil. As a result, Armada's claim in tort for negligence is barred by the "economic loss rule." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

17. Pursuant to the written contract of sale, ConocoPhillips is entitled to recover prejudgment interest at the contract rate of prime-plus-2%, and may bring a post-judgment application calculating that figure for the Court. *See, e.g., Atmel Corporation v. Silicon Storage Technology, Inc.*, 202 F.Supp.2d 1096 (N.D.Cal. 2002).

18. Pursuant to the written contract of sale, ConocoPhillips is entitled to recover its attorney's fees and other claim resolution and litigation expenses, and may file a Fed.R.Civ.P. 54(d)(2) post-judgment motion submitting that matter for decision by the Court.

[ALTERNATIVE CONCLUSIONS OF LAW]

19. Armada has failed to offer evidence through witnesses having personal knowledge sufficient to establish that the M/V Spar Two's "manifold drip sample" is admissible, relevant, or ever conformed to the requirements of MARPOL Annex VI, Regulation 18. This is not a MARPOL enforcement action, and the "MARPOL sample" is not relevant under the contract of sale between the parties in resolving their fuel quality dispute. The M/V Spar Two also was not equipped with a proper "manual valve-setting continuous-drip sampler," there was no proper "primary sample receiving container," the sample was not drawn at the proper location, and the tamper-proof security seal was not attached in the presence of a supplier's representative.

20. Armada has failed to meet its burden of establishing the reasonable market value of the fuel oil as delivered — at the time and place of delivery — and therefore has not proven each of the essential elements of its claim for breach of warranty of description as a setoff to ConocoPhillips's counterclaim for the price of the goods sold and delivered.

21. The Court also finds that Armada failed to seasonably and reasonably mitigate its damages by its failure to promptly debunker the reportedly off-specification fuel oil to a buyer willing to pay fair value.

22. Armada has not properly pled, let alone proven, a claim for indemnity based upon economic losses suffered by its charterer, Bulkhandling, or by Spar

Shipholding. Armada does not have standing to seek these categories of damages, and there is no evidence of any negligence on the part of ConocoPhillips.

23. Furthermore, all categories of damages denominated as demurrage, off-hire time, deadfreight, and lost time while diverting course to debunker are expressly excluded by ConocoPhillips's limitation of liability and exculpatory provisions, which are fully enforceable against Armada in this action.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that Armada's three claims for relief are DENIED with prejudice, and that judgment is to be entered in favor of ConocoPhillips on those claims.

It is furthermore ORDERED, ADJUDGED, and DECREED that ConocoPhillips's claims for the price of goods sold and delivered and for breach of contract are GRANTED, and that judgment is to be entered in favor of ConocoPhillips and against Armada for the sum of $189,906.73. ConocoPhillips's third claim for relief for *quantum valebant* is dismissed without prejudice as an alternative and duplicative remedy.

ConocoPhillips is granted leave to file an application for an award of prejudgment interest, as well as a motion for an award of attorney's fees, other claim resolution and litigation expenses, and for costs.

IT IS SO ORDERED.

Date: _____  
                                                                         _____  
                                                                         The Honorable Samuel Conti  
                                                                         Judge, United States District Court