1  STEPHEN THOMAS ERB (SBN 125248)
   STEPHEN THOMAS ERB, APC
2  11440 West Bernardo Court, Suite 204
   San Diego, California 92127
3  Telephone:   (858) 487-2728
   Facsimile:    (858) 487-5886
4  Email:   s.erb@erbapc.com

5  Attorney for Defendant and Counterclaimant
   ConocoPhillips Company
6

7

8

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11
   ARMADA BULK CARRIERS, LTD,          )  Case No. C 05-3406 SC
12 a Foreign Corporation,              )
                                       )
13          Plaintiff,                 )  **DEFENDANT & COUNTERCLAIMANT**
                                       )  **CONOCOPHILLIPS COMPANY'S**
14 v.                                  )  **TRIAL BRIEF**
                                       )
15 CONOCOPHILLIPS COMPANY, INC.,       )
   a Delaware Corporation, FOSS        )
16 MARITIME COMPANY, INC.,             )
   a Washington Corporation; FOSS      )
17 MARITIME BARGE 185 P3, *in rem*;    )
   SPAR SHIPHOLDING, AS, a Foreign     )
18 Corporation; M/V SPAR TWO, *in rem* )
                                       )
19          Defendants.                )  Pretrial Conf:   May 4, 2007
   _____ )
20                                     )  Trial:           May 7, 2007
   AND ALL RELATED COUNTERCLAIMS       )
21 _____ )  Judge:           Hon. Samuel Conti

22

23

24

25

26

27

28

ConocoPhillips Company's Trial Brief

1

# **TABLE OF CONTENTS**

2

3

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

CONOCOPHILLIPS PROOF OF PRODUCT QUALITY . . . . . . . . . . . . . . . . . . 2

5

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6

7      A.    The Samples Obtained by ConocoPhillips Are Binding on the
             Buyer, Which Armada Admits Met All ISO 8217 Specifications. . . . . 3

8      B.    Armada Cannot Establish Its Compliance With Each of the
             Conditions Under The Contract of Sale for Making a Fuel Quality
9            Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10     C.    Armada Cannot Meet Its Burden of Showing That the Quality of
             the Fuel Oil Upon Conveyance of Title Failed to Meet Contract
11           Specifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12     D.    Judgment Can and Should Be Entered in Favor of ConocoPhillips
             on All Claims and Counterclaims Between the Parties. . . . . . . . . . . 10

13

14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3
*Armada Supply, Inc. v. S/T Agios Nikolas*
        613 F.Supp. 1459 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4
*Chicago Prime Packers v. Northern Food Trading Co.*
        408 F.3d 894 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

5

6
*Daubert v. Merrell Dow Pharmaceuticals*
        509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) . . . . . . . . . . . . . . 6

7
*East River Steamship Corp. v. Transamerica Delaval, Inc.*
        476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) . . . . . . . . . . . . . . 10

8

9
*Foster Wheeler Energy Corp. v. An Ning Jiang M/V*
        383 F.3d 349 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10
*Turner v. Burlington Northern Sante Fe R. Co.*
        338 F. 3d 1058 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11
*United States v. Abrogar*
        459 F.3d 430 (3rd Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12

13

14
Codes and Statutes:

15
33 U.S.C. § 1908(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16
UCC § 2-313(1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

17
UCC § 2-313(1)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18
UCC § 2-607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

19
UCC § 2-709(1)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

20
UCC § 2-714(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21

22
Rules of Court:

23
Fed.R.Civ.P. 27(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

24
Fed.R.Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

25

26
Other Authorities:

27
MARPOL Annex VI Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

28

1   Defendant and Counterclaimant ConocoPhillips Company ("ConocoPhillips")

2   respectfully submits the following Trial Brief in connection with the trial presently

3   scheduled to begin on May 7, 2007.  Plaintiff and counterdefendant Armada Bulk

4   Carriers, Ltd. ("Armada") has dismissed defendant Spar Shipholding, AS, and has

5   reportedly reached a settlement with defendant Foss Maritime Company ("Foss").

6                                   **INTRODUCTION**

7       This action involves claims and counterclaims arising out of the June 2005 sale

8   of bunker fuel to the time-charterers of a vessel engaged in international maritime

9   commerce.  Armada, as buyer, was represented by sophisticated international marine

10  fuels brokers, World Fuel Services, Inc.  The contract was formed June 14th for a June

11  20th delivery.  On June 16th, Armada's own Port Captain was in Stockton, California, to

12  conduct a survey of the vessel, M/V Spar Two (herein, sometimes, "Vessel").

13      Relying upon an unwitnessed "drip sample" taken aboard the Vessel, Armada

14  has refused to pay any portion of the $189,906.73 invoice due to ConocoPhillips for 550

15  metric tons of heavy fuel oil sold to Armada and delivered to the M/V Spar Two.  The

16  fuel oil has caused no injury to the vessel's machinery or equipment.  It was never

17  returned, but rather carried halfway around the world and debunkered — reportedly,

18  and oddly, for no consideration — in Piraeus, Greece, on September 18, 2005.

19      Armada contends the fuel oil failed to meet ISO 8217 specifications for

20  allowable concentrations of water, ash, aluminum, and silicon at the point it was

21  tendered for transfer to the delivery barge, Foss Barge 185 P3.  Whether viewed as a

22  claim for failure to deliver conforming goods accepted by a  buyer and never returned

23  (with or without effective revocation of acceptance) or as breach of a warranty of

24  description, the burden is upon Armada to show the fuel oil was nonconforming, or "off-

25  spec," at the transfer point, *viz.* the ConocoPhillips Richmond Terminal load dock.

26  Armada offers no direct evidence, and nothing but inadmissable expert speculation, on

27  this issue.

28

1    Given the mobility of oceangoing vessels, their officers, and their crew, sellers

2  of bunker fuel are wise to define in advance the fuel oil samples which will govern

3  disputes and the claim presentation process.  Here, ConocoPhillips did exactly that.

4  Both a contractual conclusive presumption of quality as well as Armada's failure to

5  comply with conditions for presenting a fuel quality claim afford complete defenses to

6  Armada's claim of "off-spec" delivery.  As a result, the full invoice amount is owed to

7  ConocoPhillips, and Armada's claims must be dismissed with prejudice.

8                     **CONOCOPHILLIPS PROOF OF PRODUCT QUALITY**

9    Armada does not contest the accuracy of the independent laboratory analyses

10  of fuel oil samples ordered by ConocoPhillips as part of Richmond Terminal's normal

11  quality control procedures.  As to these samples, Armada cannot and does not contend

12  any particular item exceeded ISO 8217 (*viz.* contract) specifications.  Armada also has

13  offered no evidence of there being any "off-specification" fuel oil in the ConocoPhillips

14  chain of purchases, transport, storage, and delivery at any point prior to when the fuel

15  oil was actually onboard the M/V Spar Two.

16    By way of summary:  Aboard the tanker M/T Sperchios, fuel oil destined for

17  shore tank 3927 tested 0.04% for ash, 4 ppm aluminum, and 10 ppm silicon. ISO 8217

18  specifications allow up to 1.0% water, 0.10% ash, and 80 ppm combined aluminum and

19  silicon.  No ConocoPhillips sample exceeded these levels, or any other ISO 8217

20  specification. On the barge Columbia, in transport from the M/T Sperchios to Richmond

21  Terminal, the water tested 0.2%.  The Rodeo refinery HSCAT added to this fuel in tank

22  3927 on June 2, 2005, by its nature does not contain elevated levels of aluminum or

23  silicon.

24    On June 6, 2005, after blending and before delivery, Columbia Inspection

25  obtained an upper-middle-lower composite sample.  Water was 0.15% and ash was

26  0.069%. The nature of the tests run, and the results, of this June 6, 2005, analysis were

27  provided essentially verbatim to Armada's broker on June 14, 2005, prior to forming the

28  contract of sale.  No further analyses were requested by Armada or its broker.

1    Samples taken by Columbia Inspection on June 20, 2005 — immediately prior

2  to the barge delivery — from shore tanks 3927 and 3944 were combined in the

3  laboratory in a 95% - 5% composite ratio (the same as the barge-blend delivery itself)

4  and tested 0.3% for water, 13 ppm silicon, and 13 ppm aluminum on June 29, 2005.

5  Samples taken by Columbia Inspection from each of the four Foss Barge 186 P3

6  compartments after loading, then combined in equal proportions in the laboratory, were

7  tested as a composite on June 29, 2005.  Water was 0.3%, aluminum 5 ppm, and

8  silicon 12 ppm.

9    Finally, corroborating the accuracy of Columbia Inspection's barge composite

10  sample described above, the hand composite created in the field and delivered to Foss

11  Maritime was tested by BSI Inspectorate on July 6, 2005.  Water was 0.4%, aluminum

12  7 ppm, silicon 18 ppm, and ash 0.052%.

13

14                                    **LEGAL ARGUMENT**

15  **A.    The Samples Obtained by ConocoPhillips Are Binding on the Buyer, Which Armada Admits Met All ISO 8217 Specifications.**

16    Parties to a commercial contract of sale — particularly one between merchants

17  — are generally free to define the rules governing the resolution of their disputes.  Here,

18  ConocoPhillips did so quite plainly, and the Court is required to give those provisions

19  their full effect.  *See, e.g., Foster Wheeler Energy Corp. v. An Ning Jiang M/V,* 383 F.3d

20  349, 354-55 (5th Cir. 2004) (federal courts sitting in admiralty should give full effect to

21  the plain meaning of the parties' written agreement).

22    Under the contract of sale as affirmatively alleged in pleadings by both parties,

23  marine fuel quality is to be conclusively determined by samples taken by the seller, or

24  by an independent inspector, in accordance with the seller's *normal procedures* at the

25  port of delivery.  Armada does not contend ConocoPhillips failed to adhere to its normal

26  quality control practices.  Rather, Armada attempts to rewrite the agreement to require

27  that ConocoPhillips conform to *Armada's* after-the-fact view of "industry practices."

28

ConocoPhillips Company's Trial Brief

1    Armada now insists that better, "more representative," samples could and
2    should have been taken.  That objection, itself remarkably hypertechnical on the facts
3    of this case, was waived long ago.  Armada failed to avail itself of the contractual right
4    to jointly appoint (and share the cost of) a different inspection firm.  Armada also made
5    no advance inquiries, requests, or objections, between June 14 and 20, 2005, about the
6    sampling methods.  Most importantly, Armada did not attend and witness, and certainly
7    did not properly object in writing or otherwise, to the sampling methods employed.

8    The parties' agreement does not by its language require a "representative"
9    sample be drawn, primarily because given the varying contexts and circumstances,
10   "representative" means different things to different individuals.  No particular American
11   Society for Testing and Materials ("ASTM") alternative method of sampling is specified.
12   The barge samples drawn by Columbia Inspection actually captured product from the
13   portions of the load most likely to contain contaminants, *if* they were present.  Columbia
14   Inspection and ConocoPhillips have thus provided evidence that the "worst case
15   scenario" was well within acceptable levels of these contaminants.

16   The parties' written contract refers plainly to ConocoPhillips's normal
17   procedures, and requires that a buyer lodge timely written objections to sampling
18   procedures.  Armada did not do so, is deemed to have waived such objections.
19   ConocoPhillips is fully prepared to show its product met all specifications, but it never
20   bargained for having to bear the expense of a lengthy trial over multifaceted, nonbinding
21   "industry practices" as the cost for getting paid on its invoice.

22   **B.    Armada Cannot Establish Its Compliance With Each of the**
23        **Conditions Under The Contract of Sale for Making a Fuel Quality**
        **Claim.**

24   ConocoPhillips requires, as *conditions* to a buyer making a fuel quality claim,
25   that certain critical bunkers history documentation be provided to ConocoPhillips by the
26   buyer.  In other words, ConocoPhillips does not limit its recourse to litigation discovery
27   remedies. It provides that inadequately-documented claims are substantively defective
28   in the same manner a shortened contractual statute of limitations makes claims

defective.  ConocoPhillips is wise to insist upon this documentation given the mobility of vessels and witnesses — well beyond the courts' subpoena power — and the ease with which bunker fuel can be commingled onboard a vessel.  As an example of the difficulties of proof, even intrigue, sometimes associated with fuel oil disputes in a maritime setting, the Court is respectfully referred to the decision in *Armada Supply, Inc. v. S/T Agios Nikolas*, 613 F.Supp. 1459 (S.D.N.Y. 1985).

Section 7(B) of the "Marine Fuels Purchase/Sale Addendum" requires the buyer to provide accurate details of quantities and locations of all bunkers onboard the vessel together with the quantity, quality, product specifications, and the date, place, and identity of each supplier of the three (3) preceding deliveries.  This is a heavy fuel oil claim, not a marine diesel fuel transaction.  ConocoPhillips is entitled to an accurate, logical, complete explanation of the three prior fuel oil deliveries to the M/V Spar Two. Armada at different times has provided *some* information, but has otherwise materially failed to satisfy this condition to making its claim.

ConocoPhillips will show at trial that Armada's incomplete and inaccurate production of relevant documentation defeats Armada's claim.  For example, why (and with what) did the M/V Spar Two commingle ConocoPhillips's bunkers at time of delivery?  There were 23 metric tons of some unidentified product already in Tank 1C on June 20th.  In view of the fact *fuel oil* Tank 4P had been used for storing *sludge*, what was the nature, origin, and transfer history of the 35 cubic meters of material in that tank on June 16th?  The Vessel's logs indicate Tank 4P had been fully emptied back in March 2005, and there is no record of any transfers into that tank between March and June, 2005.

In reverse chronological order, the first immediately-preceding fuel oil delivery involved 620 cubic meters acquired in Thailand on May 15, 2005.  All of that fuel oil went into Tank 3C;  most of it was consumed.  It was not transferred to any other tank according to the Vessel's logs.  Therefore, *that* fuel oil was not the 23 cubic meters in Tank 1C or the 35 cubic meters in 4P on June 20th.  The claim documentation provided

1   by Armada as to the second and third immediately-preceding deliveries of fuel oil is
2   wholly inadequate, and severely handicaps ConocoPhillips in this litigation.

3      The M/V Spar Two's engine room logs provide conflicting information with
4   respect to the Vietnam bunkers. The Engine Room Log reflects a March 25, 2005,
5   delivery (consistent with the terminal's documentation), but the Oil Record Book reflects
6   an April 1st delivery into a nonexistent tank. Assuming, first, a record-keeping error (as
7   to dates and "2P" being "2C"), then only two deliveries, not *three*, have been
8   documented — Vietnam once and Thailand once.

9      If there were *two* separate Vietnam deliveries, then no documents concerning
10  the April 1st bunkers have been provided. Of course, if the Vessel obtained two
11  deliveries in Vietnam, then the integrity of the Vessel's logs is called sharply into
12  question. There would had to have been debunkering activities never recorded or
13  owned up to. This scenario would suggest the Vessel has committed fraud in
14  connection with several bunker transactions and as against two subcharterers.

15     Finally, Armada's experts apparently challenge the representiveness of the
16  barge composite sample which, by the contract of sale, is dispositive. Results of tests
17  on that sample have been repeated by a second laboratory's testing of the sealed
18  sample given to the barge company. ConocoPhillips is confident that, if Armada and
19  the Vessel had maintained safe-keeping of the *third* sealed barge sample — delivered
20  to the Vessel and then brought ashore — allowing it also to be tested, that sample
21  would *again* corroborate the accuracy of the two other samples. That evidentiary
22  opportunity was lost when Armada and the Vessel inexcusably failed to preserve this
23  the sample, failing to satisfy another condition to its making this claim.

24  **C. Armada Cannot Meet Its Burden of Showing That the Quality of the
    Fuel Oil Upon Conveyance of Title Failed to Meet Contract**
25  **Specifications.**

26     All laboratory analyses of fuel oil samples taken prior to transfer of title and risk
27  (as well as immediately after) demonstrate that the fuel oil delivered to Armada met all
28  contract specifications. As explained in ConocoPhillips's *Daubert* challenge to

Armada's experts' opinions, Armada does little more than attempt to create a "reasonable doubt," as it were, as to whether ConocoPhillips ever fully ruled out the possibility it *might* have had off-specification fuel oil somewhere in its storage and delivery chain.

This is a civil suit.  Armada must affirmatively establish the existence of shoreside contaminated fuel oil and its delivery to the Vessel.  The burden is not upon ConocoPhillips to establish that every discrete barrel of the load — as distinguished from the various sampled portions — met specifications.  Under applicable law, by accepting delivery and not returning purportedly nonconforming goods, Armada's sole remedy is for breach of warranty, as to which Armada has the burden of proof.

Uniform Commercial Code § 2-607 provides in pertinent part as follows:

> (1)    They buyer must pay at the contract rate for any
>        goods accepted.
>
> * * *
>
> (2)    The burden is on the buyer to establish any breach
>        with respect to the goods accepted.

Armada's pleadings are confusing, to say the least, in seeking to recover the contract price, which admittedly it has never paid.  Under the Uniform Commercial Code, however, Armada is first liable to ConocoPhillips for the full contract price under UCC § 2-709(1)(a).  It is then free to raise, by way of setoff, a claim for breach of warranty on which it bears the burden of proof.  Armada has not designated an expert to opine on the difference between market value as warranted and market value as to that which Armada alleges was delivered.  *See* UCC § 2-714(2)

A seller of goods has a duty to tender conforming goods for delivery at the point title and risk are conveyed. *See, e.g., Chicago Prime Packers v. Northern Food Trading Co.*, 408 F.3d 894, 898 (7th Cir. 2005).  Here, that meant the fuel oil was not to exceed acceptable levels of water, aluminum, silicon, and ash when passing the permanent flange of the Foss Barge 185 P3.  A warranty of description under UCC § 2-313(1)(b) is breached, if at all, based upon the condition and quality of goods when tendered for

1   delivery, whether or not the breach is discovered later or causes damage later.  (This
2   action does not involve a warranty of future performance, which ConocoPhillips
3   expressly disclaimed.) On the facts of this case, this creates two evidentiary challenges
4   for Armada, which Armada is unprepared to meet with admissible evidence in proper
5   form.

6       First and foremost, Armada must come forward with admissible evidence that
7   there *was* contaminated fuel oil at the Richmond Terminal — elevated both in water and
8   in metals — which could possibly have been delivered to the M/V Spar Two.  Armada
9   cannot rely upon pure speculation, whether in the form of expert opinion testimony or
10  otherwise.  Armada received notice of the Vessel's fuel oil sample's analysis within
11  several days of the delivery.  Experienced brokers and attorneys quickly became
12  involved. Information was exchanged informally and cooperatively. Armada could have
13  sought and obtained third-party information relevant to potential shoreside sources of
14  contamination, assuming such sources ever existed.   It failed to do so.

15      Mistakenly believing the M/V Spar Two had obtained a proper MARPOL Annex
16  VI sample, and mistakenly believing it can now rewrite the parties' commercial contract
17  of sale, Armada improperly attempts to inject international MARPOL Annex VI
18  Guidelines into this purely commercial dispute.[1]  A vessel's MARPOL sample and a
19  "commercial sample" are entirely distinct.   MARPOL international treaties and
20  corresponding United States implementing statutes and regulations do not legislate the
21  commercial terms of bunker fuel sales and do not provide a private right of action.
22  Armada can point to no agreement between itself and ConocoPhillips where the parties
23  made any "MARPOL sample," or *any* vessel sample, either relevant or determinative

24

25  _____

26      [1]Granted, if for some unusual reason, the United States Coast Guard or a foreign
    MARPOL enforcement agency were to have cited the M/V Spar Two for illegal emissions
    connected to the ConocoPhillips bunkers, the parties' respective MARPOL compliance
27  obligations — by law and by contract — might well have become relevant.  That is not the
    case before the Court, however.  Also, at the most fundamental level, Armada has failed to
28  offer admissible evidence through a declarant with personal knowledge to establish the
    vessel's full compliance with MARPOL Annex VI Guidelines, including joint sample witnessing.

1   in a commercial fuel quality dispute.[2]

2          It is presently entirely unclear how Armada intends to establish a foundation for

3   admission of the laboratory analysis of the Vessel "drip sample," or any other Vessel

4   sample.  Armada produced no declarations on personal knowledge in opposing

5   ConocoPhillips's Motion for Summary Judgment in order to explain the prior use and

6   contents of the Vessel's pipeline, the nature of the sampling "equipment," the collection

7   of the sample, and the chain of custody thereafter.  This is a critical item of evidence for

8   Armada which cannot be slipped into evidence under Fed.R.Evid. 703.  *See, e.g.,*

9   *Turner v. Burlington Northern Sante Fe R. Co.*, 338 F. 3d 1058, 1060-61 (9th Cir. 2003).

10          Purportedly to "preserve evidence" — jointly against ConocoPhillips — Armada

11   and its subcharterer, Bulkhandling Handysize, conducted "depositions" aboard the M/V

12   Spar Two in Kalama, Washington, on July 6 and 7, 2005.  ConocoPhillips was not

13   present.   No effort was made to comply with Fed.R.Civ.P. 27(a).   At best,

14   ConocoPhillips was asked to implicitly stipulate to the "depositions" by an email

15   message to Houston after close of business the day before the depositions.  Obviously

16   ConocoPhillips did not so stipulate.

17          During the pendency of this action, Armada's counsel freely communicated with

18   at least the most important of these same individuals, the Chief Engineer.  He *talked*

19   about conducting their depositions, but never did so.  These witnesses all reside in India

20   or are at sea, well beyond the Court's subpoena power.  The July 2005 "depositions,"

21   however, were markedly incomplete, more friendly and leading than adversarial.  The

22   transcripts of those proceedings are not admissible against ConocoPhillips.

23          Finally, going well outside the pleadings and the contract between the parties,

24   Armada declares the "drip sample" to be a "MARPOL sample" binding on the parties.

25   ConocoPhillips received no advance notice of this position, which contradicts the

26   _____

27   [2]Ironically, Armada has made no effort to explain the several discrepancies appearing
    in the M/V Spar Two's Oil Record Book despite strict MARPOL and United States regulations
    governing this area of ship operations. See, e.g., *United States v. Abrogar,* 459 F.3d 430 (3rd

28   Cir. 2006) (appeal from sentencing following guilty plea to violation of 33 U.S.C. § 1908(a), for
    failure to keep an accurate Oil Record Book).

1   contract of sale and would have required ConocoPhillips to send a representative out

2   by barge to witness the sample.  The Vessel does *not* have proper sampling equipment,

3   and did *not* follow MARPOL Guidelines, a copy of which is attached hereto for the

4   Court's reference.  Guidelines 3.3, 3.4, 4, 5.1, 5.2, 5.3, 6, 7.2, and 8.1 all appear to have

5   been violated by the Vessel.

6        The Guidelines specifically state: "This sample is to be used solely for

7   determination of compliance with Annex VI of MARPOL 73/78."  Granted, if sufficient

8   primary sample product is available, *by agreement* the parties *could have* provided that

9   a similarly-obtained sample governs fuel quality disputes as well.  Here, the parties

10  simply did *not* so agree.   The so-called "MARPOL drip sample" is substantively

11  irrelevant in the action before this Court.

12

13  **D.      Judgment Can and Should Be Entered in Favor of ConocoPhillips
        on All Claims and Counterclaims Between the Parties.**

14        Even though Armada never paid the $189,000 contract price to ConocoPhillips,

15  Armada filed suit first, seeking damages of $189,000 without having ever paid that sum.

16  Amended twice, Armada's complaint each time has raised the same three claims for

17  relief against ConocoPhillips.  First, Armada seeks damages for "breach of contract" on

18  the basis of one alleged breach — delivery of fuel oil exceeding specifications for water,

19  ash, aluminum, and silicon.  Second, Armada seeks damages for breach of warranty

20  on the same factual basis.  Third, Armada seeks damages for negligence on the same

21  factual theory.   The tort claim is barred by the "economic loss rule."  *East River*

22  *Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90

23  L.Ed.2d 865 (1986) (adopting "economic loss rule" under American maritime law).

24        At various times, Armada has alluded to a threatened claim by the Vessel's

25  subcharterer, Bulkhandling Handysize, involving off-hire time, deadfreight, and lost time.

26  Armada has never included these categories of damages in a properly-pled claim for

27  indemnity, however, or as damages recoverable in Armada's own name on any theory.

28  All of these categories of damages are also expressly excluded by ConocoPhillips's

ConocoPhillips Company's Trial Brief

1    limitation of liability provisions in the contract of sale.

2          ConocoPhillips has filed counterclaims alleging three closely-related theories

3    of recovery.  First, having accepted allegedly nonconforming goods, Armada is liable

4    to ConocoPhillips for the price of goods delivered and Armada has the burden of

5    establishing its claim of setoff.  Second, the failure to pay the agreed consideration is

6    a total breach of contract because ConocoPhillips has fully performed its obligations

7    and there are no grounds for claiming a setoff.  Third, alternatively, even if the Court

8    finds somehow that the product failed to meet contract specifications, it did have some

9    market value for which ConocoPhillips is entitled to payment under a theory of *quantum*

10   *valebant*.  The third claim can be dismissed as duplicative if judgment is entered in

11   ConocoPhillips's favor on the first two counterclaims for relief.

12                                  **CONCLUSION**

13         ConocoPhillips is entitled to judgment in its favor on all claims and

14   counterclaims, together with an award of prejudgment interest, attorney's fees, and

15   costs subject to proof by way of post-trial application and motion.

16                                          Respectfully submitted,

17   Dated: April 27, 2007                 STEPHEN THOMAS ERB, APC

18                                          */s/ Stephen Thomas Erb*

19                                          By: _____
                                                 Stephen Thomas Erb, Esq.
20                                               Attorney for Defendant &
                                                 Counterclaimant
21                                               ConocoPhillips Company

22

23

24

25

26

27

28

<u>Appendix</u>

ANNEX 2

RESOLUTION MEPC.96(47)

Adopted on 8 March 2002

GUIDELINES FOR THE SAMPLING OF FUEL OIL FOR DETERMINATION OF
COMPLIANCE WITH ANNEX VI OF MARPOL 73/78

THE MARINE ENVIRONMENT PROTECTION COMMITTEE,

RECALLING Article 38(a) of the Convention on the International Maritime Organization concerning the functions of the Marine Environment Protection Committee (the Committee) conferred upon it by international conventions for the prevention and control of marine pollution,

RECALLING ALSO that the Conference of Parties to the International Convention for the Prevention of Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto (MARPOL 73/78), held in September 1997, adopted the Protocol of 1997 to amend MARPOL 73/78 with a new Annex VI on the Prevention of Air Pollution from Ships,

NOTING that regulation 18(6) on fuel oil quality within Annex VI of MARPOL 73/78 requires that the bunker delivery note shall be accompanied by a representative sample of the fuel oil delivered taking into account guidelines to be developed by the Organization,

BEING AWARE that this requirement cannot be enforced before the entry into force of the Protocol of 1997,

BEING AWARE ALSO that relevant Guidelines have to be developed before the entry into force of the Protocol of 1997 in preparation for the implementation of Annex VI of MARPOL 73/78,

HAVING CONSIDERED the draft Guidelines prepared by the Sub-Committee on Ship Design and Equipment at its forty-fourth session,

1    ADOPTS the Guidelines for the sampling of fuel oil for determination of compliance with Annex VI of MARPOL 73/78, as set out in the Annex to this resolution;

2    INVITES Governments to apply the Guidelines from the date of entry into force of the Protocol of 1997.

MEPC 47/20
ANNEX 2
Page 2

ANNEX

## GUIDELINES FOR THE SAMPLING OF FUEL OIL FOR DETERMINATION OF COMPLIANCE WITH ANNEX VI OF MARPOL 73/78

### TABLE OF CONTENTS

|     |                                    | Page |
| --- | ---------------------------------- | ---- |
| 1.  | Preface                            | 3    |
| 2.  | Introduction                       | 3    |
| 3.  | Definitions                        | 3    |
| 4.  | Sampling methods                   | 3    |
| 5.  | Sampling and sample integrity      | 4    |
| 6.  | Sampling location                  | 4    |
| 7.  | Retained Sample handling           | 4    |
| 8.  | Sealing of the Retained Sample     | 4    |
| 9.  | Retained Sample storage            | 5    |

I:\MEPC\47\20.DOC

**1      Preface**

The primary objective of these Guidelines is to establish an agreed method to obtain a representative sample of the fuel oil for combustion purposes delivered for use on board ships.

**2      Introduction**

The basis for these Guidelines is regulation 18(3) of Annex VI to MARPOL 73/78, which provides that for each ship subject to regulations 5 and 6 of that Annex, details of fuel oil for combustion purposes delivered to, and used on board the ship, shall be recorded by means of a bunker delivery note which shall contain at least the information specified in appendix V to that Annex.  In accordance with regulation 18(6) of Annex VI, the bunker delivery note shall be accompanied by a representative sample of the fuel oil delivered.  This sample is to be used solely for determination of compliance with Annex VI of MARPOL 73/78.

**3      Definitions**

For the purpose of these Guidelines:

*3.1     Supplier's representative* is the individual from the bunker tanker who is responsible for the delivery and documentation or, in the case of deliveries direct from the shore to the ship, the person who is responsible for the delivery and documentation.

*3.2     Ship's representative* is the ship's master or officer in charge who is responsible for receiving bunkers and documentation.

*3.3     Representative sample* is a product specimen having its physical and chemical characteristics identical to the average characteristics of the total volume being sampled.

*3.4     Primary sample* is the representative sample of the fuel delivered to the ship collected throughout the bunkering period obtained by the sampling equipment positioned at the bunker manifold of the receiving ship.

*3.5     Retained sample* is the representative sample in accordance with regulation 18(6) of Annex VI to MARPOL 73/78, of the fuel delivered to the ship derived from the primary sample.

**4      Sampling methods**

The primary sample should be obtained by one of the following methods:

.1      manual valve-setting continuous-drip sampler; or

.2      time-proportional automatic sampler; or

.3      flow-proportional automatic sampler.

4.2     Sampling equipment should be used in accordance with manufacturer's instructions, or guidelines, as appropriate.

MEPC 47/20
ANNEX 2
Page 4

**5        Sampling and sample integrity**

5.1     A means should be provided to seal the sampling equipment throughout the period of supply.

5.2     Attention should be given to:

.1      the form of set up of the sampler;

.2      the form of the primary sample container;

.3      the cleanliness and dryness of the sampler and the primary sample container prior to use;

.4      the setting of the means used to control the flow to the primary sample container; and

.5      the method to be used to secure the sample from tampering or contamination during the bunker operation.

5.3     The primary sample receiving container should be attached to the sampling equipment and sealed so as to prevent tampering or contamination of the sample throughout the bunker delivery period.

**6        Sampling location**

For the purpose of these Guidelines a sample of the fuel delivered to the ship should be obtained at the receiving ship's inlet bunker manifold and should be drawn continuously throughout the bunker delivery period.[*]

**7        Retained sample handling**

7.1     The retained sample container should be clean and dry.

7.2     Immediately prior to filling the retained sample container, the primary sample quantity should be thoroughly agitated to ensure that it is homogenous.

7.3     The retained sample should be of sufficient quantity to perform the tests required but should not be less than 400 ml.  The container should be filled to 90% ± 5% capacity and sealed.

**8        Sealing of the retained sample**

8.1     Immediately following collection of the retained sample, a tamper proof security seal with a unique means of identification should be installed by the supplier's representative in the presence of the ship's representative.   A label containing the following information should be secured to the retained sample container:

---

[*] The phrase "be drawn continuously throughout the bunker delivery period" in paragraph 6 of the Guidelines should be taken  to mean continuous collection of drip sample throughout the delivery of bunker fuel covering each bunker delivery note.  In case of receiving an amount of bunker fuel necessitating two or more delivery notes, the sampling work may be temporarily stopped to change sample bags and bottles and then resumed as necessary.
I:\MEPC\47\20.DOC

.1     location at which, and the method by which, the sample was drawn;

.2     date of commencement of delivery;

.3     name of bunker tanker/bunker installation;

.4     name and IMO number of the receiving ship;

.5     signatures and names of the supplier's representative and the ship's representative;

.6     details of seal identification; and

.7     bunker grade.

8.2    To facilitate cross-reference details of the seal, identification may also be recorded on the bunker delivery note.

## 9    Retained sample storage

9.1    The retained sample should be kept in a safe storage location, outside the ship's accommodation, where personnel would not be exposed to vapours which may be released from the sample. Care should be exercised when entering a sample storage location.

9.2    The retained sample should be stored in a sheltered location where it will not be subject to elevated temperatures, preferably at a cool/ambient temperature, and where it will not be exposed to direct sunlight.

9.3    Pursuant to regulation 18(6) of Annex VI of MARPOL 73/78, the retained sample should be retained under the ship's control until the fuel oil is substantially consumed, but in any case for a period of not less than 12 months from the time of delivery.

9.4    The ship's master should develop and maintain a system to keep track of the retained samples.

***