**COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP**
Gregory W. Poulos (SBN 131428)
Lynn L. Krieger (SBN 209592)
190 The Embarcadero
San Francisco, CA 94105
Telephone No.: 415-438-4600
Facsimile No.: 415-438-4601

Attorneys for Armada Bulk Carriers, LTD

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARMADA BULK CARRIERS, LTD, a Foreign Corporation<br><br>Plaintiff,<br><br>v.<br><br>CONOCOPHILLIPS COMPANY, INC., a Delaware Corporation, FOSS MARITIME COMPANY, INC., a Washington Corporation, and FOSS MARITIME BARGE 185 P3, *in rem*,<br><br>Defendants. | Case No.: C 05- 3406 SC<br><br>**ARMADA BULK CARRIERS, LTD'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**TRIAL DATE: May 7, 2007**<br>**Time: 9:30 a.m.**<br><br>**Hon. Judge Samuel Conti** |

This matter came on for trial on May 7, 2007 before the Honorable Samuel E. Conti of the United States District Court for the Northern District of California. By stipulation of the parties the matter was tried to the Court sitting without a jury. Considering all of the evidence presented at trial, the arguments of counsel and the pleadings and briefing provided by the parties, the Court makes the following finds of fact and conclusions of law.

## I. FINDINGS OF FACT

A. Armada Bulk Carriers, Ltd. ("ARMADA") was the charterer of the M/V SPAR TWO pursuant to a time charter for a single voyage to carry cement from Thailand to Stockton, California. As the charterer, Armada owed a contractual duty to re-supply the

vessel with fuel oil at the conclusion of the charter party. It was during this re-supplying of the vessel that the present dispute arose.

B. ConocoPhillips Company, Inc. is a Texas and Delaware Corporation engaged in various petroleum-related businesses worldwide including refining, transporting, storing, blending and sales. In this case CP was acting as the seller of marine fuel oil from a terminal that it owns and operates in Richmond, California ("Richmond terminal").

C. On June 14, 2005 CP and Armada entered into a contract for the sale / purchase of fuel oil to be supplied to the M/V SPAR TWO as it lay afloat in San Francisco Bay. The fuel oil was required to meet certain specifications set forth in a standard known as IFO 180 / RME 25. Among the requirements for that grade of fuel oil are that the combined aluminum and silicon content cannot exceed 80 ppm, the water cannot exceed 1.0% and the total ash content may not exceed 0.10 %.

D. The sales / purchase contract was arranged through a neutral broker from Trans-Tec / World Fuel Services ("WFS"). WFS was paid a commission by CP. The broker confirmed the sale / purchase to both parties by a nomination setting forth a description of the product ordered and some basic contract terms.

Regarding the quality of the fuel oil, the contract provides that the oil was to meet the standards described above. The broker's confirmation provided that the sale was "accepted in accordance with Seller's normal terms and conditions."

E. On June 14, 2005, the same day as the broker issued its confirmation, CP issued a "Spot Sale Agreement" confirming that it was selling "Fuel Oil 180" and listed as "additional provisions" that the product sold would meet "RME25 Product Specifications except vanadium typically 265 ppm." This document has places for two signatures, but it was never signed. It does however provide evidence that CP agreed to deliver oil meeting the RME 25 requirements.

F. CP's "normal terms and conditions" are spread across multiple documents each of which contains various incorporation clauses. They also provide that some terms

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

are adopted unless there is a conflict with one of the other documents, in which case the reader must go back to the other documents. Among the additional terms that are incorporated by reference into the General Terms and Conditions are the CP "Marine Provisions" and the "Marine Fuels Sales / Purchase Addendum."

G. The terms and condition were not provided to Armada until June 29, 2005, which was more than a week after the dispute arose.

H. The Relevant Terms of the Contract Are As follows:

**<u>CP's "General Terms and Conditions."</u> ("GT&C)** (Exhibit 2) This portion of the contract sets forth some definitions that are applicable throughout. These definitions include:

1. <u>DEFINITIONS</u>

(a) "Agreement" "means the contract formed by the Special Provisions set forth in the Confirmation to which these General Terms apply."

* * *

(c) "ASTM" means American society of Testing Materials and "API" means American Petroleum Institute."

* * *

(o) "Regulations" means all federal, state and local laws, ordinances, rules, codes, regulations and lawful orders of any federal, state or local governmental authority applicable to the Product or either Party's performance of the Agreement.

* * *

(q) "Special Provisions" means those terms, conditions or provisions set forth in the Confirmation or acceptance of Product to which these General Terms are to any extent incorporated by reference or which is made subject to these General Terms.

* * *

(w) "Vessel" means a tankship or barge employed for the purpose of transporting Product."

3.1 <u>Specifications and Warranty</u>:
Seller warrants that the Product(s) delivered hereunder shall conform to the specifications contained in the Special Provisions of the Agreement. There are no guaranties, warranties, or, representations which extend beyond the description of the Product(s) set forth in the Agreement.[1]

3.2 <u>FOB, CFR and CIF Deliveries – Measurement</u>:

---

[1] This paragraph also excludes warranties of merchantability and fitness for a particular purpose, neither of which are at issue in this case.

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

For Product delivered CIF and CFR basis, on loaded quantities as is evidenced by independent inspector's report to be based on shore tank measurements taken prior to and after loading of Seller's vessel according to latest ASTM/API standards.

* * *

Quality is to be based on shore tank composite samples taken prior to loading…Inspection shall be carried out by a mutually acceptable independent inspection company whose findings, save fraud or manifest error, shall be final and binding on the Parties….

3.9 Notice of Claim:

Notice of claim as to defect in quantity or quality with respect to any cargo of Product shall be made in writing to Seller immediately after such apparent defect is discovered. Any such notice of claim shall be followed promptly by a formal written claim with all necessary details to properly process such claim.

10. Default:
Any of the following shall be considered a "Default" if, notwithstanding any other provision of the Agreement, either Party (the "Non-Performing Party") shall

* * *

(a) fail to make timely delivery of any Products due and owing the other party under the Agreement;

* * *

(c) breach of any representation, warranty or any other non-payment obligation under the Agreement…;

10.3 The Performing Party's rights under this Section shall be in addition to, and not in limitation or exclusion of, any other rights which the performing Party may have (whether by agreement, operation of law or otherwise) including, but not limited to the sale to a third party of the Product which is the subject of the Agreement. The Non-Performing Party shall indemnify and hold the Performing Party harmless from all costs and expenses (including reasonable attorney fees) incurred in the exercise of any remedies hereunder."

14.1 INDEMNITY:
Seller and Buyer mutually covenant to protect, defend, indemnify and hold each other harmless from and against any and all claims, demands, suits, losses, expenses (including without limitations, costs of defense, attorney's fees and interest), damages, fines, penalties, causes of action and liabilities of every type and character, including but not limited to personal injury or death to any person including employees of either Party or loss or damage to any personal or real property, caused by, arising out of or resulting from the acts or omissions of negligence or willful acts of such indemnifying Party, its officers, employees or agents with respect to the purchase and sale of Product hereunder. In the event the Parties are jointly and/ or concurrently negligent, each Party shall indemnify the other Party to the extent of its negligent acts or omissions or willful acts.

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

16.1 Product(s) sold hereunder shall be produced and delivered in full compliance with all applicable governmental laws, regulations and orders. Without limitation to the foregoing, Products shall comply, as applicable, with Regulations for (I) gasoline and alcohol blends; (ii) low sulfur diesel; (iii) reformulated gasoline, and (iv) gasoline additives.

* * *

17. NEW OR CHANGED REGULATIONS:

17.1 It is understood by the Parties that Seller is entering into this Agreement in reliance on the laws, rules, regulations, decrees, agreements, concessions and arrangements (hereinafter called "Regulations") in effect on the date hereof with governments, governmental instrumentalities or public authorities affecting the Product sold hereunder including, but without limitation to the generality of the foregoing, those relating to the production, acquisition, gathering, manufacturing, transportation, storage, export, trading or delivery thereof, insofar as such regulations affect Seller or Seller's Supplier.

17.2 In the event that at any time and from time to time any regulations are changed or new regulations become effective, whether by law, decree or regulation or by response to the insistence or request of any governmental or public authority or any person purporting to act therefore, and the material effect of such changed or new regulations (a) is not covered by any other provision hereunder, and (b) has a material adverse economic effect upon Seller, Seller shall have the option to request re-negotiation of the prices or other pertinent terms hereunder. Such option may be exercised by Seller at any time after such changed or new regulation is promulgated, by written notice of desire to re-negotiate, such notice to contain the new prices or terms desired by Seller.

18. MARINE PROVISIONS:

18.1 If delivery is to be made by water-borne transportation, the attached ConocoPhillips Company's Marine Provisions shall apply.

**CP's Marine Provisions ("MP")** contain their own definitions. Among the defined terms are:

1. "Agreement" means the Special Provisions, the General Terms and Conditions and these Marine Provisions.

* * *

4. "Cargo" means any products, gas liquids…crude oil or condensate as described elsewhere in this contract.

* * *

13. "Special Provisions" means the specific transaction terms and conditions of the Agreement including but not limited to provisions relating to quantity, quality, term, delivery and price and which manifests a contract for sale of a Cargo.

* * *

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

16. "Vessel" means any inland barge, tow, ocean-going barge or tanker and includes any Ocean-Going Vessel and any Inland Vessel. ..

17. "Vessel Party" means the party taking delivery on, or making delivery from, a Vessel.

(Exhibit 3, ¶II)

Paragraph X (Quantity and Quality Determinations) of the MPs states:

1. Independent Inspection: The quantity and quality of the cargo delivered to or from Vessels shall be determined by an independent, licensed petroleum inspector. The cost of the inspection service shall be shared equally between both parties. All measurements must meet the guidelines set out in the American Petroleum Institute ("API") Manual of Petroleum Measurement Standards Chapter 17. – Marine Measurement, and all applicable API Bulletins and standard publications. The inspector's determination as to quantity and quality shall be conclusive and binding upon both parties *except for fraud or manifest error.*

2. Notification of Quantity/Quality Claims: Any claim by the receiving party (buyer) for a shortage in quantity or defect in quality shall be made in writing and actually received by the delivering party (seller), within sixty (60) days from the time of disconnection of hoses at the Cargo Transfer Point. IF A WRITTEN CLAIM IS NOT ACTUALLY RECEIVED BY THE DELIVERING PARTY (SELLER) WITHIN THE SPECIFIED TIME, THE CLAIM WILL BE DEEMED TO BE WAIVED. (Exhibit 3, ¶X(1 & 2) (Italicized Emphasis added).

**CP "Marine Fuels Purchase/Sale Addendum." ("MFSA")** This document begins with a paragraph setting forth how conflicts are to be resolved between the various contractual terms. It reads:

> ConocoPhillips' Products Purchase/Sale General Terms and Conditions ("Seller's General Terms and Conditions") are incorporated herein by this reference. In the event of a conflict between Seller's General Terms and Conditions and the following terms and conditions, the terms of the latter shall prevail. Seller will supply or has supplied to Buyer marine fuel or other products on the following terms and conditions. Each transaction specifically negotiated between Seller and Buyer shall be evidenced by Seller's confirmation telex, facsimile or electronic message referred to herein as "Sales Confirmation." In the event of any conflict between these terms and conditions and the terms of the Sales Confirmation, the terms of the latter shall prevail.

The MFSA contains several provisions that are applicable.

Paragraph 2C it states that:

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO SAN FRANCISCO, CA 94105 TEL: 415-438-4600 FAX: 415-438-4601

> Unless a delivered price is set forth in the sales confirmation, all prices are F.O.B. Seller's terminal. Buyer appoints seller as agent to procure barge delivery and agrees to reimburse seller according to the barge company's current tariff or rate schedule.

Paragraph 3A reads:

> The Marine fuels supplied hereunder shall be seller's commercial grades offered to customers generally at the time and delivery port from time to time. Seller's fuel grades will conform to ISO 8217 specifications. Other minimum and maximum quality specifications shall be as set forth in the sales confirmation.

Paragraph 3B provides:

> Buyer shall be solely responsible for nominating to seller the grade of marine fuels for each delivery from among the range of fuels then offered for sale by seller. Seller warrants that the marine fuels supplied hereunder shall be within the industry standard for the grade nominated by buyer and that the marine fuels supplied shall be of merchantable quality. Unless otherwise agreed in writing by seller, no other specifications are warranted.

Paragraphs 6A & 6B provide:

> A. Unless a mutually acceptable independent inspector is appointed to take samples (whose fees shall be borne equally by seller and buyer), seller shall take not less than two (2) identical samples in accordance with its normal sampling procedures at the delivery port.
> Buyer has a right to have a representative witness such sampling.
>
> B. Buyer waives any objections to the sampling procedures actually employed unless buyer had a representative witness sampling and at the time of delivery gave seller a written protest about the procedures.

Paragraph 7B provides:

> 7B Any claim by buyer for quality deficiency or nonconformity must be received by seller in writing an accompanied by all *then available* supporting documents within thirty (30) days of delivery. It is a pre-condition of seller's consideration of a quality claim that *at the time buyer gives seller notice*, that buyer has retained its sealed retain sample provided by seller. Buyer's notice must contain full details including: the quantities and locations of all bunkers on board the vessel; the rate and quantity of consumption since delivery; the location immediately prior to consumption of bunkers consumed; for each of the three (3) preceding deliveries to the vessel, the quantity, quality and specification of product supplied, the place and date of supply and the name of the supplier; and the information concerning the whereabouts of buyer's sealed retain sample.
>
> 7D In the event of a quality claim, the parties agree to have the sample retained by seller analyzed by a mutually agreed, qualified and independent laboratory. The costs of the analysis shall be borne equally by seller and buyer. Buyer may cause the testing of the sample provided to the vessel at is sole cost sand expense; however,

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

> dispositive determination of quality of product delivered shall be based upon test results of an independent laboratory in the port of bunkering of the sealed and marked samples retained by seller from the delivery.[2]

The MFSA also provides that:

> B. CLAIMS RELATED TO FUEL QUALITY: SELLER'S LIABILITY FOR DELIVERY OF FUEL WITH NON-CONFORMING SPECIFICATIONS SHALL BE LIMITED TO THE COSTS INCURRED TO REMOVE THE FUEL FROM THE VESSEL AND TO REPLACE IT TO THE EXTENT SUCH FUEL WAS DELIVERED UNDER THIS AGREEMENT.
>
> C. SELLER SHALL NOT BE LIABLE FOR ANY LOSS OF PROFIT OR ANTICIPATED PROFIT, LOSS OF TIME OR HIRE, OVERHEAD EXPENSES, DEMURRAGE OR LOSS OF SCHEDULE, COST OF SUBSTITUTE VESSEL(S), LOSS RELATED TO LOSS OF OPERATIONAL USE OF VESSEL, PHYSICAL LOSS OR DAMAGE (IN WHOLE OR IN PART) OF OR TO VESSEL OR CARGO, OR FOR ANY LOSS OF CONTRACT(S) OF AFFREIGHTMENT TO THE EXTENT THAT THE FOREGOING OF ANY OF THEM ARE CONSEQUENTIAL, INDIRECT OR SPECIAL LOSSES OR SPECIAL DAMAGES NOR WITHOUT PREJUDICE TO THE FOREGOING FOR ANY OTHER CONSEQUENTIAL, INDIRECT SPECIAL LOSSES OR SPECIAL DAMAGES, ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS AGREEMENT.

The contract also provides that the sample to be taken and thus relied upon is one that will be taken "in accordance with [CP's] normal sampling procedures at the delivery port." MSFS ¶6A. CP does not have "normal sampling procedures" but instead relies on the sampling to be done by professional sampling companies using industry standard procedures. The contract also repeatedly states that sampling will be done in compliance with ASTM / API standards, and the CP representative, Mr. Stillings, admitted that he expected Columbia Inspections to do its sampling and testing in compliance with the industry standards.

I. The contract provides that it will be subject to the maritime law of the United States and the law of New York. Both the maritime law and New York law provide for application of the Uniform Commercial Code.

J. The fuel oil was delivered by CP on June 21, 2005.

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

K. The delivery took place via a barge that was loaded at the Richmond terminal and then used to transport the oil to the vessel at anchorage in San Francisco Bay.

L. At the Richmond terminal CP pumped onto the barge two products rather than the one product ordered under the contract. CP first pumped a product known as IFO 380 to the barge. It then pumped "cutter stock" to the barge.

M. The Court finds that blending in the manner described above does not result in a uniform blend and this fact was known to CP prior to the blending.

N. There is no provision in the contract that permits this type of delivery.

O. The Court finds that the delivery of two products to the barge which would need to be blended in order to create the product actually ordered was a breach of the contract.

P. The Court also finds that the oil as delivered failed to meet the specifications of IFO180 / RME 25. This was a further breach of the contract.

Q. The Court further finds that after Armada demanded the removal and replacement of the bunkers, CP's failure to comply with its contract obligations was a breach of the contract.

R. When the barge arrived alongside the SPAR TWO, the delivery was done through hoses connecting the barge to the vessel. Just prior to this delivery, MARPOL Annex VI came into effect, and this Annex and the contract terms require that a sample of the fuel oil loaded aboard the vessel be taken by certain methods designed to capture a representative sample.

S. The contract requires that CP'S bunker delivery "comply with Regulations 14 and 18 of MARPOL ANNEX VI."

T. The sampling done by CP prior to delivery did not comply with industry standards and CP did not use any of the approved methods for sampling the product as it made the delivery to the vessel. The sample taken by the inspector retained by CP took his samples at the wrong time during the barge loading and used the wrong equipment. The

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

Court also finds that the inspector did not properly create a volumetric composite, and failed to properly handle and label the products after sampling.

U. When the product was loaded from the barge to the vessel a continuous drip sample was taken by the vessel crew. The method used by the vessel to obtain its drip sample was through a "manual valve setting continuous drip sampler." The sampling method used by the vessel was compliant with industry standards and MARPOL Annex VI.

V. The court finds that the manifold drip sample taken by the vessel's crew during the loading from the barge to the vessel is the most representative sample of the goods actually sold and delivered.

W. The manifold drip sample was sent by the vessel to a laboratory in Houston, Texas for testing, and the results showed that the oil had excessive levels of aluminum, silicon, ash and water. A later test on a duplicate sample conducted at a laboratory in California confirmed the same results.

X. On June 25 the vessel was notified that the oil did not meet the contract specifications and should not be used. The laboratory reported that the samples showed the oil was high in aluminum, silicon and water and that use of the fuel oil could cause damage to the vessel's engines.

Y. On June 29, 2005 another sample was taken from the vessel's 1 Center Fuel Tank where the fuel oil delivered by CP was stored. This oil had not been mixed with any other oil on the vessel at the time of sampling.

Z. CP was invited to attend the sampling on June 29, 2005 but refused participation.

AA. The sample taken from the vessel's 1 Center tank on June 29 was done in compliance with ASTM / API standards. Tests run on this sample showed that the oil delivered to the vessel did not meet the specifications provided in the contract. While there are slight differences in the quality between the bunker manifold sample and the June 29

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

sample, these differences are due to gravitational settling of the heavier elements in the storage tank.

BB. On June 27, 2005, after receiving notice that the fuel oil failed to meet specifications, Armada notified the brokers and CP and demanded that CP remove the oil from the vessel. CP refused. CP was also invited to participate in further testing to confirm the characteristics of the oil. CP also refused to participate in further sampling or testing.

CC. After CP refused to debunker the vessel in San Francisco, Armada was unable to arrange for any other company to take the oil in San Francisco Bay, and as a result the vessel proceeded to Portland, Oregon as its next port of call.

DD. While the vessel was in Portland, Armada again sought CP's agreement to debunker the vessel, and CP again refused. Armada also contacted two other companies that were capable of debunkering the vessel in Portland, but both companies refused to debunker the oil due to the high levels of aluminum and silicon. The vessel then proceed to its next port of call, Singapore, where it attempted to debunker.

EE. Debunkering operations were attempted in Singapore, but due to problems encountered by the debunkering company in using portable pumps, the debunkering could not be completed. Only a small quantity of oil could be debunkered in Singapore.

FF. Eventually, the vessel was able to debunker in Piraeus, Greece but only on the basis that the oil in the tank was "slops" and was disposed of with no payment to Armada or the vessel owners. In the interim, due to CP's refusal to debunker the vessel in San Francisco or Portland, Armada was forced to incur various expenses related to the storage of the oil, the debunkering efforts in various ports and other expenses related to the maintenance of the oil on board the vessel. Substantial legal fees were also incurred by the owners and by Armada.

///

///

///

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

## II. CONCLUSIONS OF LAW

A. The Court finds that the following UCC provisions are applicable.

B. Under the UCC, goods are *not* "accepted" unless the buyer "after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity." UCC §2-606. There is no evidence that Armada ever "accepted" the oil. In fact, the Court finds that Armada timely rejected the oil by requesting that CP arrange debunkering first in San Francisco and then in Portland, Oregon.

C. UCC Section 2-607 only requires the buyer to pay for any goods "accepted. Since Armada never "accepted" the oil it has no obligation to pay for it.

D. The Uniform Commercial Code, §2-602, allows a buyer a "reasonable time after [the goods] delivery or tender" to reject them. If goods have been properly rejected, the seller retains the burden of proof to establish that the goods were delivered in conformance with the contract requirements. *Miron v. Yonkers Raceway, Inc.*, 400 F.2d 112, 119 (2d Cir. 1968).

E. Only if the buyer has accepted the goods does the burden shift to the buyer to establish the non-conformity. UCC §2-607(4). Armada rejected the oil on June 27 when it requested that CP remove the oil from the vessel. UCC § 2-608 provides that a buyer may revoke its acceptance where the non-conformity substantially impairs the value of the goods accepted and the discovery of the non-conformity was induced by the difficulty of its discovery before acceptance. The Court finds that if there was an acceptance, such acceptance was timely revoked. In such circumstances, the buyer has the same rights and duties as if it had rejected the goods. UCC §2-608(b)(3).

F. Under the UCC, if the buyer rejects the goods after taking physical possession, then the buyer is "under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them, but otherwise the buyer "has no further obligations with regard to goods rightfully rejected."

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

UCC §2-602. UCC §2-603 requires that the buyer "...follow any reasonable instructions received from the seller with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the seller's account if they are perishable or threaten to decline in value speedily." The UCC also provides that when the buyer is forced to sell the goods, the buyer is only obligated to act in "good faith" and "he is entitled to reimbursement from the seller...for reasonable expenses of caring for and selling them..." UCC §2-603(2) & (3).

G. Because Armada never accepted the oil, the burden of proving that the fuel oil met specifications remains with CP.

H. In order to meet its burden of proof that the oil met the contract specifications, CP sought to rely on a provision in the contract providing that the binding sample for quality determination issues is a sample described as "the sealed and marked sampled retained by seller from delivery." (Marine Fuels Purchase / Sale Addendum ("MFSA") ¶7D).

I. The established industry sampling procedures are contained in Chapter 8 of the Manual of Petroleum Measurement Standards. The testimony of the person who performed the sampling (Hussain Nassir) and the testimony of Armada's expert, establish that the samples taken by CP were not taken in compliance with industry standards designed to ensure that the samples are representative of the oil as a whole.

J. Since the contract requires that the samples taken by CP be taken in compliance with the industry standards, failure to take the samples in compliance with those precludes CP's reliance on them. The contract specifically provides that samples will not be binding in cases of "manifest error."

K. CP also failed to provide any notice to Armada that the sampling was going to take place. When a contract contains a provision giving a party the right to be present for an inspection "the right to be notified of the time of such inspection is necessarily implied." *Malcomson v. Reeves Pulley Co.* 167 F. 939, 943 - 944 (6th Cir. 1909). Since Armada had

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

the right to be notified of the time and place of inspection, and was never given that notice, CP is estopped from reliance on the samples improperly obtained.

## III. DAMAGES

A. The Court finds that CP failed to meet its burden of proof that the oil delivered to Armada met the contract specifications.

B. The Court further find that in the alternative, if Armada accepted the goods it timely revoked the acceptance, leaving CP with the burden of proof, which, as noted above, CP failed to meet.

C. The Court also finds that Armada established by a preponderance of the evidence that the fuel oil delivered to the SPAR TWO was high in aluminum, silicon, ash, and water at the time of delivery.

D. Based upon these findings, the Court finds that Armada is entitled to recover its reasonable damages as provided in the UCC and awards the following items of damages:

| Deadfreight | $31,322.48 |
|---|---|
| Off Hire Singapore | $15,000.00 |
| Lost Time / Piraeus | $12,663.79 |
| | $6,813.00 |
| Owner's Legal Fees | $29,910.00 |
| Debunkering Costs in Piraeus | $22,275.05 |
| BSI Inspectorate | $4,789.50 |
| Armada Greece | $3,566.68 |
| Gulf Agency | $1,808.64 |
| SGS - SF | $1,711.00 |
| Damaged Fuel | $12,520.00 |
| Replacement bunkers | $218,458.96 |
| **GRAND TOTAL** | **$360,839.10** |

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601

E. Finally, the Court finds that the limitations provided in the contract are not applicable in light of the conflicting terms in the contract and the refusal of CP to meet its contract obligations to remove and replace the oil.

F. In addition the Court finds that the limitation remedy also fails of its essential purpose and the limitation on consequential damages fails as well for unconscionability.

G. The Court finds that CP may not shelter itself behind one segment of the contract when it repudiated and ignored its very limited obligations under that same contract.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that Armada's claims for breach of contract and breach of warranty are GRANTED, and that the judgment is to be entered in favor of Armada and against ConocoPhillips for the sum of $360,839.10. Armada's third claim for relief for negligence is dismissed without prejudice as an alternative remedy.

Armada is granted leave to file an application for an award of prejudgment interest, as well as a motion for an award of attorneys' fees, other claim resolution and litigation expenses, and for costs.

IT IS SO ORDERED

Date: ____________________

______________________________
The Honorable Samuel Conti
Judge, United States of District Court

COX, WOOTTON, GRIFFIN, HANSEN & POULOS, LLP
190 THE EMBARCADERO
SAN FRANCISCO, CA 94105
TEL: 415-438-4600
FAX: 415-438-4601