UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMADA BULK CARRIERS, a Foreign Corporation,<br><br>           Plaintiff,<br><br>  v.<br><br>CONOCOPHILLIPS COMPANY, INC., a Delaware Corporation, FOSS MARITIME COMPANY, INC., a Washington Corporation, and FOSS MARITIME BARGE 185 P3, <u>in rem</u>,<br><br>           Defendants. | No. C-05-3406 SC<br><br>FINDINGS OF FACT AND<br><u>CONCLUSIONS OF LAW</u> |

## I. **INTRODUCTION**

On August 22, 2005, Plaintiff Armada Bulk Carriers ("Plaintiff" or "Armada") filed a Complaint against Defendants ConocoPhillips Company, Inc. ("Defendant" or "CP"), Foss Maritime Company, Inc., and the Foss Maritime Barge 185 P3 (the "Barge"). See Docket No. 1. On November 13, 2006, Plaintiff filed its Second Amended Complaint, which contained causes of action for breach of contract, breach of warranty, and negligence against CP for delivering allegedly off-specification fuel oil (the "Fuel Oil"). See Docket No. 36. On December 21, 2006, CP answered the Second Amended Complaint and asserted its counterclaim against Armada for breach of contract to recover the sale price of the

Fuel Oil.  See Docket No. 46.  Just prior to trial, on May 3, 2007, the Court approved the parties' stipulated dismissal of Foss Maritime and the Foss Maritime Barge, the boat that transported the Fuel Oil from CP to Armada.  See Docket No. 121.  As a result, the only parties remaining at trial were Armada and CP.

On May 7-11 and 21-22, 2007, a bench trial was held before this Court.  Having considered the evidence presented by Armada and CP, the Court hereby FINDS in favor of CP and against Armada in the amount of $189,906.73 plus prejudgment interest.  CP should submit a motion and proposed order detailing calculations for interest, fees, and expenses, as provided under the parties' contract.

## II. PRELIMINARY FINDINGS

1. Defendant CP is engaged in various petroleum-related businesses worldwide including refining, transporting, storing, blending, and sales.  In this case, CP was acting as the seller of marine fuel oil from a terminal it owns and operates in Richmond, California (the "Richmond Terminal").

2. Plaintiff Armada entered into a time charter of the M/V Spar II (the "Vessel"), a 623-foot bulk carrier owned by Spar Shipholding AS.  At the time, the Vessel was under a long-term time charter to Bulkhandling Handysize AS, which in turn sub-chartered the Vessel to Armada.

2

3.  As the sub-charterer, Armada owed a contractual duty to re-supply the Vessel with fuel oil at the conclusion of its charter. It was during the re-supply operations that the present dispute arose.

4.  On June 14, 2005, via a broker from Trans-Tec/World Fuel Services, Armada and CP entered into a contract for CP to sell Armada between 550 and 600 metric tons of oil, which was to meet IFO 180 / RME 25 specifications excluding the level of vanadium. The IFO 180 / RME 25 specifications are equivalent to the ISO 8217 specifications referenced in the parties' contract.

5.  The relevant requirements for IFO 180 oil are: combined aluminum and silicon content cannot exceed 80 parts per million ("ppm"), water cannot exceed 1.0%, and total ash content cannot exceed 0.10%.

6.  The broker confirmed the understanding of the parties for the quantity and specifications of the Fuel Oil. Pl. Ex. 2.

7.  On June 14, 2005, the parties entered into a Spot Sale Agreement for CP to deliver 550 metric tons of IFO 180 fuel oil to the Vessel in the San Francisco Bay. Def. Ex. 501.

8.  The Spot Sale Agreement expressly incorporated the Products Purchase/Sale Agreements General Terms and Conditions dated April 1, 2004 ("General Terms and Conditions" or "GT&C"). Def. Ex. 501, 2; Pl. Ex. 131.

3

9. As applicable, the GT&C incorporates the Marine Fuels Purchase/Sale Addendum ("Marine Fuels Addendum") and the Marine Provisions.  Def. Ex. 131, 13; Pl. Ex. 132-33.

10. Per an email between Owen Stillings at CP, the company's commercial representative and scheduler responsible for the San Francisco Bay Area, and the Trans-Tec broker, CP agreed to deliver both heavy oil and cutter, which when mixed together would bring the viscosity of the Fuel Oil down to approximately 180 centistokes.  Pl. Ex. 1.  Evidence at trial showed that the oil in shore tank 3927 already met the viscosity requirements for IFO 180 oil.

11. The heavy oil was stored in CP's Richmond Terminal shore tank 3927; the cutter was stored in shore tank 3944.

12. To deliver oil of the quantity and viscosity requested by Armada, CP advised the broker that it would mix barrels of heavy oil with barrels of cutter stock in a 95%/5% ratio.

13. On June 20, 2005, CP began pumping the Fuel Oil from its Richmond Terminal to the Barge.

14. CP first loaded the heavy oil from shore tank 3927 and then loaded the cutter stock from shore tank 3944.

15. CP informed the broker that because CP had no shore-side blending capabilities, the Fuel Oil would have to blend aboard the barge during loading and transport to the Vessel; the broker agreed on Armada's behalf.  Pl. Ex 1.  Armada

4

       never objected to this blending method prior to delivery.

16. On June 20, 2005, Mr. Hussain Nassir of Columbia Inspection tested CP's 3927 and 3944 shore tanks. The samples were combined in the laboratory in a 95%/5% composite ratio to reflect the composition of the delivery.

17. On June 29, 2005, the shore tank composite sample tested 0.3% for water and 26 ppm for silicon and aluminum, meaning it met contract specifications. Pl. Ex. 117.

18. At night on June 20, 2005, Mr. Nassir boarded the Barge and prepared additional samples of the Fuel Oil. Mr. Nassir took one sample from each of the four Barge compartments to create a "Barge composite sample." He also took two additional Barge samples, of which one was delivered to the Chief Engineer of the Vessel and one retained by the Barge ("retained Barge sample"). Trial Transcript ("TT") 185, 194.

19. Testing on the Barge composite sample performed by Columbia Inspection indicated that the Fuel Oil met contract specifications. The results showed 0.3% water and 17 ppm combined aluminum and silicon. Pl. Ex. 118.

20. On July 7, 2005, BSI Inspectorate tested the retained Barge sample collected by Mr. Nassir. Consistent with the other shore tank and Barge samples, it met contract specifications. The results showed 0.4% water, 0.052% ash, and 25 ppm combined aluminum and silicon. Pl. Ex. 92.

21. After the Fuel Oil was loaded onto the Barge, the Barge crossed the Bay to dock alongside the Vessel and complete the delivery.

22. While the Fuel Oil was being pumped onto the Vessel, the Vessel's Chief Engineer, Mr. Jesia, arranged the collection of a "drip sample" from the manifold of the ship. The drip sample was collected in a 15-Liter bucket, which captured a continuous drip of oil throughout the entire loading process.

23. Mr. Jesia separated the drip sample into several containers, one of which was sent to Fobas / Caleb Brett ("Fobas") for testing.

24. The Fobas test results on the drip sample showed levels of contamination far outside the contract specifications. The results showed 4.8% water, 0.192% ash, and 304 ppm combined aluminum and silicon. Pl. Ex. 85, 2.

25. On June 27, 2005, Armada informed CP of the Fobas test results and refused to pay for the Fuel Oil, which remained in the Vessel's 1C tank.

**III.  RELEVANT CONTRACT PROVISIONS**

The parties agree on two documents which apply to this transaction: the ConocoPhillips General Terms and Conditions ("GT&C") and the Marine Fuels Addendum.

//

6

The relevant portions of the GT&C, Pl. Ex. 131, provide:

2.2  <u>FOB Delivery</u>:  Delivery shall be deemed complete and title and risk of loss shall pass from Seller to Buyer . . . in the case of vessel deliveries as Product passes the vessel's permanent manifold flange at the load port.

4.3  <u>Interest</u>:  Any amount payable for any cargo of Product or otherwise payable by Buyer to Seller hereunder shall, if not paid when due, bear interest from the due date until the date payment is received by the Seller at an annual rate (based on a 360-day year) equal to the rate of two (2) percentage points above the prime rate of interest . . . .

The relevant portions of the Marine Fuels Addendum,[1] Pl. Ex. 133, provide:

**3.  Grades**
A.  The marine fuels supplied hereunder shall be Seller's commercial grades offered to customers generally at the time and delivery port from time to time.  Seller's fuel grades will conform to ISO 8217 specifications.  Other minimum and maximum quality specifications shall be as set forth in the Sales Confirmation.

**6.  Sampling and Quality**
A.  Unless a mutually acceptable independent inspector is appointed to take samples . . . Seller shall take not less than two (2) identical samples in accordance with its normal sampling procedures at the delivery port.

Buyer has a right to have a representative witness such sampling.

B.  Buyer waives any objections to the sampling procedures actually employed unless Buyer had a representative witness sampling and at the time of delivery gave Seller a written protest about the procedures.

The samples shall be sealed and labeled by either the barge company representative, Seller's representative or independent inspector, as the case may be.  The Chief

---

[1]  The original text of the Marine Fuels Addendum was all upper case and has been modified for ease of reading.

7

Engineer will acknowledge receipt of the sample delivered to the vessel by signing and dating either a receipt or the sample label.

C.  One sample will be given to the Vessel at the time of delivery.  Not less than one (1) sample shall be retained by Seller for at least 60 days, or longer if Buyer has made a quality claim against Seller during that period.

**7.  Claims**
B.  Any claim by Buyer for quality deficiency or nonconformity must be received by Seller in writing and accompanied by all then available supporting documents within thirty (30) days of delivery.  It is a pre-condition of Seller's consideration of a quality claim that at the time Buyer gives Seller notice, that Buyer has retained its sealed retain [sic] sample provided by Seller.  Buyer's notice must contain full details including:  the quantities and locations of all bunkers on board the Vessel; the rate and quantity of consumption since delivery; the location immediately prior to consumption of bunkers consumed; for each of the three (3) preceding deliveries to the vessel, the quantity, quality and specification of product supplied, the place and date of supply and the name of the supplier; and the information concerning the whereabouts of Buyer's sealed retain [sic] sample.

D.  In the event of a quality claim, the parties agree to have the sample retained by Seller analyzed by a mutually agreed, qualified and independent laboratory.  The costs of the analysis shall be borne equally by Seller and Buyer.  Buyer may cause the testing of the sample provided to the vessel at its sole cost and expense; however, dispositive determination of quality of product delivered shall be based upon test results of an independent laboratory in the port of bunkering of the sealed and marked samples retained by Seller from the delivery.

The parties disagree as to whether the GT&C incorporates the Marine Provisions, Pl. Ex. 132, and in particular, the "fraud and manifest error standard" in Marine Provisions ¶ X.1.  Armada asserts that the Marine Provisions apply because GT&C ¶ 18.1 states: "If delivery is to be made by water-borne transportation,

8

the attached ConocoPhillips Company's Marine Provisions shall apply." Pl. Ex. 131. CP asserts that the Marine Provisions only apply to situations in which the fuel is cargo, not when the fuel is used by a vessel for propulsion. However, the inclusion or exclusion of the Marine Provisions does not change the parameters of this fuel quality dispute because language indicating that the Seller's sample will not be binding in cases of "fraud or manifest error" appears in both the Marine Provisions, Pl. Ex. 132 at ¶ X.1, and the GT&C, Pl. Ex. 131 at ¶ 3.2.

Also relevant to this quality dispute is language in the Marine Fuels Addendum stating that samples must be taken "in accordance with [Seller's] normal sampling procedures at the delivery port." Pl. Ex. 133 at ¶ 6.A. According to the Marine Fuels Addendum, the Buyer had a right to have a representative witness the sampling and "Buyer waives any objections to the sampling procedures actually employed unless Buyer had a representative witness sampling and at the time of delivery gave Seller a written protest about the procedures." Id. at ¶ 6.B.

**IV. APPLICABLE LAW**

This case falls within the Court's admiralty jurisdiction under 28 U.S.C. § 1333(1) because it involves a maritime transaction for the sale of potentially contaminated fuel delivered to a vessel and a counterclaim to recover the unpaid

9

contract price for the fuel. See Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 612 (1991) ("[L]ower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature."). "In maritime commercial transactions, the Uniform Commercial Code is taken as indicative of the federal common law of admiralty." Interpool Ltd. v. Char Yigh Marine (Panama) S.A., 890 F.2d 1453, 1459 (9th Cir. 1989), (citing G. Gilmore and C. Black, The Law of Admiralty, 718-22).

In this case, Plaintiff asks the Court to find that it properly rejected the Fuel Oil within a reasonable time after delivery or tender. In the alternative, if the Court finds that Plaintiff accepted the Fuel Oil, Plaintiff asks the Court to find that it properly revoked acceptance of the Fuel Oil. According to Plaintiff, if it satisfied either of these two situations, the burden of proof would fall on Defendant CP to show that the Fuel Oil met contract specifications. The Uniform Commercial Code, § 2-602 allows a buyer to reject goods "within a reasonable time after their delivery or tender." If the goods have been properly rejected, the Seller retains the burden of proof to establish that the goods were delivered in conformance with the contract specifications. See Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119 (2d Cir. 1968).

Here, despite the fact that the Seller's samples were deemed

10

binding under the contract, Armada notified CP on June 27, 2005 that the results of the Vessel's manifold drip sample showed that the Fuel Oil did not meet IFO 180 specifications and that Armada wished to reject the delivery. CP refused to remove and replace the Fuel Oil. Relying on the pre-delivery samples collected by Columbia Inspection showing that the Fuel Oil met contract specifications, CP asserted that those samples were a binding indication of product quality.

The Court will place the burden of proof on CP to establish that the goods met contract specifications because Armada attempted to reject the Fuel Oil upon learning the results of the manifold drip sample.

## V.   **FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.  Mr. Stillings of CP testified that CP's "normal sampling procedures" are "to rely on a certified company to conduct sampling pursuant to normal industry practices." TT 497:10-13. This testimony describes what CP was obligated to do under Marine Fuels Addendum ¶ 6.A, a part of the contract.

    a.  The Court finds that CP satisfied the first part of its obligation by hiring Columbia Inspection, a certified company, to sample the Fuel Oil.

    b.  The second part of CP's obligation involves Columbia Inspection conducting the sampling pursuant to normal

11

industry practices.

    i. The Court finds that under the contract, the Seller's sample is binding unless there is evidence of "fraud or manifest error" in the sampling or testing.

c. Armada's expert, Mr. Max Grossey, testified that normal sampling procedures in the industry dictate following the API standards for sampling and ASTM standards for laboratory testing. TT 675:1-20.

d. Having reviewed the written standards (including Pl. Ex. 110) and heard testimony from both parties, the Court finds that the written standards are more illustrative than proscriptive for this industry. Even though Armada's expert stated that Columbia Inspection did not properly conduct the sampling, the Court finds that none of Plaintiff's individual criticisms amount to manifest error. In addition, viewing the sampling in totality, CP has shown that there was no manifest error in the collection of its Barge or shore tank samples.

e. Armada asserts that the Barge samples taken by Mr. Nassir are the relevant samples under the contract, so the Court will discuss those samples.

    i. In reference to the number of samples taken from the Barge, because the compartments were seven feet

12

        high, Mr. Grossey testified that the industry standards only require the inspector to draw one sample from each Barge compartment. TT 682: 2-11.

    (1) Mr. Nassir from Columbia Inspection satisfied this standard by drawing one sample from each Barge compartment. TT 185.

    (2) Though he may have taken the sample from near the bottom of the tanks as opposed to the middle, this does not rise to the level of fraud or manifest error. Moreover, according to industry guidelines, sampling near the bottom would be more likely to detect impurities in the Fuel Oil.

        (a) Thus, CP met the contract and industry standards with respect to the number of samples taken aboard the Barge.

ii. In reference to the location of samples taken from the Barge, Mr. Nassir testified that he took a sample from each of the four Barge compartments to make a composite sample.

    (1) Thus, CP met the contract and industry standards with respect to the location of samples taken aboard the Barge.

iii. In reference to the equipment used, CP also met the

13

>           contract and industry standards. Mr. Grossey
>           testified that a zone sampler, the equipment used
>           by Mr. Nassir on the Barge, was acceptable
>           equipment for taking spot samples. TT 680-82.
>           Industry standards and practice allow the use of
>           spot samples for oil quality determination.
>      iv.  The Court also finds that the seals used by Mr.
>           Nassir were sufficient under the contract and no
>           contamination resulted from his use of a seal not
>           to Plaintiff's liking.
2. CP has established by a preponderance of the evidence that both CP and the independent inspection firm, Columbia Inspection, followed their normal procedures in obtaining and testing shore tank and barge compartment samples in connection with the sale and delivery of the Fuel Oil to Armada on June 20-21, 2005. When analyzed by independent laboratories, all of the samples taken by Columbia Inspection met contract and ISO 8217 specifications, including those for water, combined aluminum and silicon, and ash.
   a. Armada is thus bound by these samples and laboratory analyses.
3. In the days between forming the contract and loading the Fuel Oil, the Court finds that Armada had ample opportunity to sample the Fuel Oil but failed to take advantage of that

14

opportunity. Armada certainly knew when the delivery would be made via the Barge and should have sent a representative to observe Mr. Nassir's work. Under the contract, Armada had a right to have a representative witness the sampling and "Buyer waives any objections to the sampling procedures actually employed unless buyer had a representative witness sampling and at the time of delivery gave seller a written protest about the procedures." Marine Fuels Addendum, Pl. Ex. 133 at ¶ 6.B.

a. The Court finds that Armada suffered no prejudice in failing to attend and witness the sampling activities or in failing to take its own samples because, under all the facts and circumstances presented, Columbia Inspection followed normal, commercially reasonable, and industry-accepted practices in obtaining, maintaining, and testing fuel oil samples taken in connection with this sale.

b. Armada also failed to ensure the safe-keeping of the sealed Barge sample provided to the Vessel's Chief Engineer upon delivery, which was later removed from the Vessel and discarded by Thomas Hansen, who was employed by the SGS North America inspection firm. TT 1018. Armada was unable to produce this sample for testing when it was requested by CP. Armada's failure to

15

produce this sample weakens its fuel quality claim.

    c. Armada also failed to fully account for the three preceding fuel deliveries to the Vessel, including contaminated oil acquired in Vietnam.

    d. In addition, the Court finds Armada's contamination theory insufficient to refute CP's evidence that CP met the terms of the contract. Armada failed to offer admissible, non-speculative evidence sufficient to show that water and contaminants, rather than cutter stock, were delivered out of shore tank 3944. While the relatively consistent viscosity readings of the various samples lend some credence to Armada's theory, the viscosity readings are not enough to overcome Armada's contractual and evidentiary burdens.

        i. CP presented credible evidence to refute Armada's viscosity theory including: testimony from Mr. Gloeckner, the supervisor of the Richmond Terminal, that the bottom of tank 3944 is "virtually flat", TT 1113:20, that the drainage pipe used to deliver oil is six inches in diameter with a lower edge eight to ten inches from the bottom of the tank, TT 1114:18-21, and that no water resided at the bottom of tank 3944, a tank designed to prevent water accumulation, TT 1105.

16

4.  Armada asks the Court to rely on the results of the manifold drip sample collected on June 21, 2005, as the Fuel Oil was being loaded onto the Vessel.
    a.  The Court finds that the results of the manifold drip sample are not binding in this dispute because CP's samples are binding under the contract.
    b.  Armada's argument that the manifold drip sample complied with MARPOL Annex VI (the International Convention for the Prevention of Pollution from Ships) is not relevant to this fuel quality dispute. See 33 U.S.C. § 1901.
        i.  MARPOL Annex VI seeks to prevent air pollution from ships. The MARPOL guidelines state: "[T]his sample is to be used solely for determination of compliance with Annex VI of MARPOL 73/78." Thus, according to MARPOL and the parties' contract in this case, Armada's sample is not binding.
5.  In addition, Armada points to other tests taken after the Fuel Oil had been loaded onto the Vessel as further indications that the Fuel Oil did not meet contract specifications at the time of delivery.
    a.  The Court finds that these additional samples are neither binding nor relevant. All of the additional samples were taken once the Fuel Oil had already mixed with 23 cubic meters of other material in the tank. In

17

     addition, the Vessel was already carrying a bunker of contaminated oil from Vietnam.

  b. Armada failed to rule out the strong likelihood that the Fuel Oil had mixed with other materials after loading.

## VI. **CONCLUSION**

For the reasons discussed herein, the Court FINDS in favor of Defendant CP and against Plaintiff Armada in the amount of $189,906.73 plus prejudgment interest. CP should submit a motion and proposed order detailing calculations for interest, fees, and expenses, as provided under the parties' contract.

IT IS SO ORDERED.

Dated: June 22, 2007.

_____
UNITED STATES DISTRICT JUDGE